### No. 26,949.

The State of Kansas, ex rel. James A. Conly, County Attorney, *Appellee,* v. The Riverside Drainage District of Sedgwick County, Josephine Mitchell, William Henry Barnett, E. M. Martin, Alfred E. Munch et al., *Appellants.*

#### SYLLABUS BY THE COURT.

1. DRAINS—*Authority of Districts—Diverting Natural Flow into Another District.* A drainage district has no legal authority to construct a dam or dike across a natural watercourse at the place where it enters the drainage district, and thereby divert the water which naturally would flow into such drainage district through such watercourse, upon lands outside of the drainage district, when the right to do so has not been acquired by contract, condemnation, or otherwise.

2. SAME—*Restraining Unlawful Construction.* When a drainage district, without authority to do so, constructs a dam or dike across a natural watercourse at the place where it enters such drainage district, and diverts the water therefrom upon public and private property outside of such district, to the injury of such property and in such a way as to become a public as well as a private nuisance, the state, by its proper officers, may maintain an

Appeal and Error, 4 C. J. pp. 558 n. 53, 878 n. 82, 883 n. 33, 898 n. 92, 900 n. 98, 1166 n. 82; 2 R. C. L. 194. Drains, 19 C. J. p. 686 n. 11. Injunctions, 32 C. J. p. 254 n. 48, 52. Nuisances, 29 Cyc. p. 1235 n. 28. Trial, 38 Cyc. p. 1964 n. 83; 26 R. C. L. 1087, 1089.

State, *ex rel.*, v. Riverside Drainage District.

action to enjoin the maintenance of such dam or dike and to require its removal.

3. APPEAL AND ERROR—*Findings as Conclusive—Application of Rule.* The rule that findings of fact by a trial court, which are supported by substantial, competent evidence, are conclusive in this court on appeal, applies in all actions, whether legal or equitable.

4. SAME—*Argument of Counsel—Use of Map Not in Evidence for Illustration.* It is not improper for counsel in presenting a case to this court to use a map, plat, or drawing illustrative of the facts, or some portion of them, as he contends the evidence showed them to be, though such map, plat, or drawing was not introduced in evidence nor considered by the trial court.

5. TRIAL—*By Court—Presumption as to Findings.* When the court sits as a trier of facts and is asked to make findings of fact, and does so, it is presumed to make findings of fact upon all questions supported by the evidence and necessary to sustain the judgment rendered.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed March 12, 1927. Affirmed in part and reversed in part.

*Jean Madalene* and *O. A. Keach,* both of Wichita, for the appellants.

*Robert C. Foulston, W. E. Holmes, D. W. Eaton, George Siefkin, Sidney L. Foulston, Kos Harris, V. Harris, M. P. Shearer* and *R. S. Elder,* all of Wichita, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for a mandatory injunction to enjoin defendants from maintaining certain embankments across a natural watercourse where it enters the drainage district, and to require their removal. The trial court made findings of fact and conclusions of law and rendered judgment for plaintiff. Defendants have appealed. The findings and conclusions of the trial court tell the story of the controversy, and are as follows:

"FINDINGS OF FACT.

"First: This action is being presented by the state on the relation of its duly constituted officer.

"Second: The Riverside Drainage District of Sedgwick County, Kansas, was organized as a drainage district under chapter 215 of the Laws of 1905, and the defendants N. Russell, Frank Oliver, Edw. Horner, T. W. Robbins and J. E. Driscoll were the officers of such district at the time the suit was filed.

"Third: The individual defendants, Josephine Mitchell, William Henry Barnett, E. M. Martin and Alfred E. Munch were owners of land in section seven (7), township twenty-eight (28) south, range one (1) east of the 6th P. M., Sedgwick county, Kansas, at the time the suit was filed.

"Fourth: The following are the boundaries of the Riverside Drainage District: Beginning on the west bank of the Big Arkansas river, 200 rods north of the southeast corner of section 34, thence south 120 rods, thence west 320 rods,

thence north 320 rods, thence west 160 rods, thence north to the center of section 28, thence west 160 rods, thence north 160 rods, thence west 160 rods, thence north 320 rods, thence west to the southwest corner of section 17, thence north to the northwest corner of section 17, thence west 80 rods, thence in a northwesterly direction to the center of section 7, thence due north to the north line of Riverside township, thence east along the north line of Riverside township to the west bank of the big Arkansas river, thence in a southeasterly direction following the meanderings of said river to the place of beginning. All being in township 28, south, range 1 east of the 6th P. M. The Riverside Drainage District comprises about 6,000 acres of land.

"Fifth: To the west of the Arkansas river and paralleling it to some extent, is what is known as the Big Slough. The Big Slough heads in the eastern part of Reno county and follows a meandering course to the east and the south, entering section seven near the center of the west line of said section. The Big Slough drains a territory of approximately 50,000 acres.

"Sixth: To the west of the Big Slough and paralleling it to some extent is the Cowskin creek. This creek heads in the western part of Sedgwick county, somewhat south of the Big Slough, and follows a south and east meandering course until it empties into the Arkansas river in northern Sumner county, about twenty miles south and east of section seven, draining in all about 97,-000 acres.

"Seventh: Section seven is situated about four miles north of the nearest point on the Cowskin to the south and about two miles south and west from the nearest point on the Arkansas river. It is bounded on the west by the Meridian highway and on the east by Seneca street, a much traveled road maintained by the county. A mile east of Seneca street is Lawrence avenue, now a paved highway, and two miles east is Hydraulic avenue. The last named street parallels the Arkansas river for about three miles, at a distance of a little less than one-half mile.

"Eighth: The territory surrounding section seven is comparatively level, there being no hills or prominent rises in the topography of the country. The land is agricultural, most of it being in cultivation.

"Ninth: The Big Slough crosses the Meridian highway from the west and enters section seven on the west line at a point about 80 rods south of the northwest corner of the southwest quarter of said section seven, and flows in an easterly and northeasterly direction to a point about six or seven hundred feet west of the center of said section seven, where, prior to 1912 it divided into two forks. The north fork flowed across the north part of the southeast quarter of section seven in an almost east and west line, turning to the south and east after crossing Seneca street at a point about 90 rods north of the southeast corner of section seven, crossing Lawrence avenue and Hydraulic avenue and emptying into the Arkansas river in the central north part of section thirty-four, a distance of approximately six miles from section seven. This fork or channel varied in width from six to twenty feet and in depth from one foot to two or three feet. In some places it spread out and became simply a low place or depression. Prior to 1912 this fork had a well defined channel through which water frequently flowed. Sometimes it would flow continuously for a period of months; at other times it would flow only for a short period of time during the year. The north fork was, from the earliest time, known as the Big Slough

and was in fact larger and deeper than the other fork, which was called the south fork. For forty years prior to the trial of this action and prior to the building of the dike in question, whenever water ran in both the north and south fork of the Slough, seventy-five per cent of the water ran down the north fork. Before the dike was built water ran down the north fork when there was no water in the south fork. From the point where the Slough divided into the north and south forks, the south fork flowed in a southeasterly direction across the northeast corner of the southwest quarter of said section seven, across the east line of said southwest quarter at a point six or seven hundred feet south of the center of said section seven, and across the southwest corner of the southeast quarter of said section seven and across the south line of the southeast quarter of said section seven, about 60 rods east of the southwest corner of the southeast quarter of section seven; thence running in a southerly and southeasterly direction until it emptied into the Cowskin at a point a short distance east and south of Haysville in Sedgwick county, Kansas.

"Tenth: From the center of section seven to the Arkansas river, the fall of the land is 5.5 feet per mile, and the fall to the Cowskin is 4.26 feet per mile. The land from section seven slopes to the east and south.

"Eleventh: In the later part of 1912 and the early part of 1913, the Riverside Drainage District constructed a dike in section seven which was enlarged in 1923. The dike now is about two to two and one-half feet higher than the surrounding ground, and is about eight feet in thickness at the bottom. It starts at a point about 600 feet north of the center of section seven and runs about 1,200 feet straight south, then turning at an angle of about sixteen degrees to the southeast and continuing about 2,100 feet to the south line of section seven. In 1923 a new earthen dike about 2½ feet high and 10 feet in width at the bottom was built by the Riverside Drainage District, commencing about one yard south and 177 yards east of the center of section seven running in a southwesterly direction about 190 yards to a point about 72 feet east of that part of the old dike herein described, which runs north and south in length about 1,200 feet. The new dike prevents the water from passing naturally to the east to the Arkansas river and diverts the water in a southerly direction. The dike as constructed crosses the main channel of the Big Slough as it existed prior to 1912, and is on the east bank of the south fork of the Big Slough. A ditch about twenty feet wide was dug directly to the west of the main dike, and a channel was cut leading south from the dike following substantially the channel of the south fork of the Big Slough.

"Twelfth: Since the construction of the dike and the ditches, the land lying to the east of the dike in section seven has been cultivated and the channel of the Big Slough filled up so that this fork is hardly descernible, although formerly it was quite distinctly visible. Elevations taken through this territory faintly disclose such channel and low places, continuing to the east line of said section, and from there the channel is distinctly visible until it enters the Arkansas river. The water which flows from a point about six to seven hundred feet west of the center of section 7, involved in this case, and which from that point finds its outlet southward along what the court has designated the south fork of the Big Slough, originates at and comes from points west and north of

the center of section 7, and no appreciable part of the water which flows through the ditch that is near the west line of the southeast quarter of section 7, and which leaves this quarter section at the south line of the southeast quarter, originates in the Riverside Drainage District or flows from the Riverside Drainage District into said ditch.

"Thirteenth: Several bridges span the Big Slough east of section seven, two being railroad bridges of over one hundred feet in length. One of these bridges was erected prior to 1912, and the other followed the same manner of construction. Prior to 1912, small culverts were built to carry the overflow water which went into the south fork of the Big Slough. Since the erection of the dike and the construction of the ditches in section seven and leading south therefrom, the bridge at the south line of section seven has been enlarged to a forty-foot bridge, and the other bridges to the south have all been increased in size.

"Fourteenth: During the years of 1877, 1904 and 1923 disastrous floods occurred in the territory in the vicinity of section seven, the Arkansas river, Big Slough and Cowskin creek all being joined in one continuous body of water.

"Fifteenth: Prior to the erection of the dike and ditches, in times of ordinary rainfall and freshets, the water flowing down the channel and naturally draining by means of the Big Slough entered section seven from the west and passed to the east through the channel of the Big Slough, continuing to the east across the center of section seven and thence south and east to the Arkansas river. Ordinarily no water passed to the south. In cases of extremely high water, when the water overflowed the channel of the Big Slough, some of the water went to the south, and continuing along the south fork of the Big Slough, emptied into the Cowskin. Except in the cases of floods, but little damage was done to the crops, land, roads or bridges to the south of section seven. Since the erection of the dike and the ditches, all ordinary waters have been diverted from the natural main channel to the east, and an unreasonable and unnatural quantity of waters has been caused to flow to the south through the south fork of the Big Slough, and in cases of ordinary rains or freshets the water spreads over the flat country to the south on each side of the south fork of the Big Slough, and has caused, and unless abated will continue to cause, great damage as hereinafter stated to the crops, lands, bridges and roads to the south of section seven and lying between section seven and the Cowskin. The constant flow of water through the south fork caused by the diverting of the same, has caused a channel to be made in the south fork of the Big Slough, which is now easily discernible to the eye.

"Sixteenth: The Cowskin is a narrow creek, and in times of high water is only able to take care of its own water, and the result of the diversion of all of the waters of the Big Slough to the Cowskin has caused the Cowskin creek to overflow and flood the land through which it flows and adjacent thereto.

"Seventeenth: In times of flood or extremely high water, the dike causes two feet more of the water that would ordinarily go to the east to be un-

naturally forced and drained to the south, and has caused damage to a large part of the lands lying between section seven and the Cowskin.

"Eighteenth: When the water rises above the dikes in flood times the whole country for miles is overflowed with water. The greater part of the water flows east over the center of section seven instead of south. During the flood of 1921, when the dike broke, the water on the Vilm farm, being the northwest quarter of section eighteen, township 28, range 1 west, fell two feet in a very short time.

"Nineteenth: The effect of the unnatural and unreasonable diversions of waters to the south by reason of the maintenance of the dike and ditches near the center of section seven, has in the past caused, and will in the future cause great damage, among which are the following: The large area of lands to the south of section seven lying without the boundaries of the Riverside Drainage district are and will be flooded during times of ordinary rainfall and freshets, when they would not otherwise be flooded, and the crops and vegetation thereon destroyed; the roads and highways, including the highway running east and west on the south side of section seven, Seneca street, the Meridian highway and other public grounds, have been and will hereafter be unreasonably and unnaturally flooded and inundated, rendering the same impassable and unusable to the general public, and the general public will be deprived of the use thereof; and the schoolhouse located within the district thus unnaturally and unreasonably flooded has been, and will be, rendered inaccessible for use. Because of the connection of the land lying without said Riverside Drainage District and thus damaged, and because of the fact that the waters are being unnaturally and unreasonably so diverted by reason of said dike and ditches, the drainage of the entire district affected is retarded and the time required for the natural passage of such waters is greatly increased.

"Twentieth: The Riverside Drainage District has not contracted with or otherwise secured the consent of Sedgwick county or the state of Kansas or any owners of private property south of section seven, which has been damaged and will hereafter be damaged by the unlawful diversion of the waters, nor has any condemnation proceedings been attempted, nor has any compensation for such damage been paid or provided for.

"Twenty-first: The construction and maintenance of said dike, dam and ditches near the center of section seven has caused and will hereafter continue to cause general damage and injury to the public, and injury and damage to the private property lying south of section seven, and the said Riverside Drainage District has not provided any funds or otherwise made provision for the payment of damages which may hereafter accrue by reason of the unreasonable, unlawful and unnatural diversion of the waters as above stated.

"Twenty-second: The plan adopted by the defendant to repel the surface water from the district and unreasonably and unnaturally to divert the same upon lands not within said district, is not a lawful exercise of any lawful powers of said drainage district, and such dam, dike and ditches have been erected and are now being maintained without lawful authority and with the

purpose and intent to throw the waters naturally draining through said district upon the lands of others and the public highways and property under the control of the state of Kansas. In building and maintaining such dam, dike and ditches the officers of the Riverside Drainage District believed that they were lawfully authorized to do so.

"Twenty-third: In 1912-'13 a ditch was dug by the Riverside Drainage District from a point in the northeast quarter of section seven, township 28 S, range one east, southeasterly entering into the Arkansas river at a point in section 34 of the same township. This ditch was intended to and does care for the larger part of the local drainage and water from a small slough to the north extending into the neighborhood of the Orient shops and Friends University within the city of Wichita and east of the territory known as the Big Slough.

"Twenty-fourth: The court finds generally in favor of the plaintiff and against the defendants.

"Twenty-fifth: The north fork crosses the center of section 7, as indicated in exhibits N and Q, and flows in an easterly and southeasterly direction as indicated by the line C-C-C-C-C, on exhibit N; and in the southeast quarter of section 7, the defendants dammed up the water in the north fork at the places indicated by the new and the old dikes on exhibits N and Q, and as described in finding No. 11.

## "CONCLUSIONS OF LAW.

"First: The defendants have no right in law to divert the waters of a natural watercourse from its channel.

"Second: While the owner of land through which a natural water course flows has a right to divert a stream from its channel upon his own land, he must return it unimpaired to the channel through which it formerly flowed, before it leaves his land.

"Third: While the Riverside Drainage District would not be responsible for injuries occasioned by the natural flow of surface water from the land in its district upon adjacent land, yet when it caused surface water to be accumulated upon land and caused the same to be cast in a volume upon the land of others outside of the district, it then created a nuisance.

"Fourth: While the drainage act permits and authorizes the changing of the course of natural watercourses and the building of dams, dikes, embankments and ditches, it does not authorize the commission of a nuisance.

"Fifth: The maintenance of said dike, dam and ditches near the center of section 7 constitutes a public nuisance.

"Sixth: The unreasonable and unlawful diversion of waters at the center of section 7 is unlawful. The plaintiff has the right to compel the removal of the dike, dam and ditches so that said waters at the center of section seven will flow in the natural and normal course and channel.

"Seventh: A mandatory injunction is a proper remedy to abate said nuisance, there being no adequate remedy at law to protect the plaintiff and the public and private property which has and will in the future be damaged and injured by the unlawful acts of the defendant drainage district.

"Eighth: That the plaintiff has the right to have the dike, dam and ditches

removed and the land returned to the condition in which it existed prior to the construction work hereon by the defendant drainage district."

Appellants contend that the decision of this court in *Drainage District v. Drainage District*, 104 Kan. 233, 178 Pac. 433, controls the controversy here and requires a reversal of the judgment in this case. That case came to this court to review a ruling which sustained a demurrer to the petition. The plaintiff was an organized drainage district, No. 3, adjoining the Riverside Drainage District on the west. The relief sought was, in part at least, the same relief sought in this case. This court held (syl. ¶ 3) that plaintiff could not maintain the action; that such an action must be brought by the state at the instance of the attorney-general or the county attorney. This case is so brought, and appellants concede that on this question the former decision is not in point. But appellants rely upon the following holding of this court in that case:

"Under the drainage act, Laws of 1905, chapter 215, it is competent for the directors of a drainage district to change the channels of watercourses and relocate and establish new ones, and to that end they may make contracts with landowners outside of the district, and the judgment and discretion so vested may be exercised by them without interference or control by the courts, unless fraud or bad faith enters into their action.

"The fact that the directors may have had a wrong conception of their duties or have taken some illegal steps in the performance of their duties, does not necessarily imply bad faith nor that their conduct was so arbitrary, capricious and unreasonable as to indicate an abuse of the power conferred." (Syl. ¶¶ 1, 2.)

We first note that in the case before us the court found that the defendant drainage district had not, by contract with landowners outside of the district, or by condemnation, or otherwise, obtained the right to relocate and establish watercourses on land outside of the district. In the absence of such acquired authority it is not contended in this case that such authority existed, neither is it contended that the holding of this court upon that point in the former case is controlling here. But it is contended the holding does imply that fraud or bad faith must enter into the action of the officers of the drainage district before the court would be authorized to interfere with or control their acts. In this case the court specifically refused to make a finding requested by defendants "that the officers of the defendant drainage district acted in all matters in good faith." The court did find (part of finding No. 22): "In building and maintaining such dam, dike and ditches the officers

of the Riverside Drainage District believed that they were lawfully authorized to do so." And appellants contend this is equivalent to a finding of good faith on their part. But it can hardly be so construed, in view of the specific refusal of the court to find such good faith, and in view of the finding of the court that their acts were unlawful, and in view of the findings of the court that the result of such unlawful acts was a continuing public nuisance, injurious both to public and to private rights and property. That such unlawful acts may be the equivalent of fraud and justify injunctive relief was ruled in *State, ex rel., v. Mowry,* 119 Kan. 74, 237 Pac. 1032.

Appellants lay much stress upon the rule that when officers act within the scope of the powers conferred on them there will be no judicial interference with their discretion and judgment, citing *Shanks v. Pearson,* 66 Kan. 168, 71 Pac. 252, and allied cases. The difficulty of applying that rule in this case is that under the findings of the court the officers of the defendant drainage district were not acting within the scope of the power conferred on them when they put a dike across a natural watercourse, the result of which was to prevent the water which naturally flows along and through the watercourse from entering the drainage district, without making any provision, by contract with landowners outside the drainage district, or by condemnation, which would authorize them to prevent such waters from entering the drainage district. The officers have authority by statute to change a natural course within the drainage district. (R. S. 24-407.) But that wasn't what they did. By the dikes built they prevented the ordinary flow of the water of the natural watercourse from entering their district, and this was not within the scope of the power conferred upon them. Appellants contend that, generally speaking, the officers of the drainage district had before them two plans for the control of the water—they could let the water into the drainage district, or they could, by dikes, prevent it from entering the district—and that whichever plan was adopted was a matter of discretion of the officers of the drainage district. The difficulty with this reasoning is that one of these plans was within the power conferred upon them; the other was not. If both plans had been within the power conferred upon them by law, their discretion would not be subject to review by the court. But where one of the plans was authorized

by law and the other was not, and the one not authorized was the one adopted, and that resulted in injury and damage both to public and to private rights and property, such action cannot be justified by a claim of the exercise of discretion.

Appellants contend that the relief sought is equitable in its nature and that this court on appeal should consider and weigh the evidence, and will disregard the findings and judgment of the trial court if they are found to be against the clear weight of the evidence. This is an inaccurate statement of the rule of law applicable to findings of the trial court. In this court there is no difference between actions at law and in equity with respect to a review of the findings of the trial court. In either case, where the evidence is conflicting, we do not weigh it. We are bound by such findings as to the facts.

In *Farney v. Hauser,* 109 Kan. 75, 198 Pac. 178, it was held:

"Where there is substantial evidence to support a finding made by the trial court or jury, the supreme court adopts such finding as an ascertained fact although the record also contains evidence to the contrary; and the supreme court cannot independently undertake to determine the relative weight of the evidence, except in cases where the controlling evidence is documentary or by deposition; and this rule is the same whether the cause be in the nature of an action at law or a suit in equity." (Syl. ¶ 7.)

The question was again urged in *State, ex rel., v. Telephone Co.,* 115 Kan. 236, 223 Pac. 771. The court said:

"The public utilities commission argues that this court is not bound by the facts found by the trial court, but may examine the evidence to determine the weight and sufficiency thereof and find other facts different from those found by the trial court as this court may conclude are established by the evidence. The argument of the commission is that this is a suit in equity, and that in suits in equity the appellate court examines the evidence the same as the trial court. The rule that the verdict of the jury or the findings of fact made by a referee in the district court, when approved by that court, will not be disturbed in the supreme court where the verdict or findings are supported by evidence has been followed during the whole of the history of this state. Probably that rule has been followed five hundred times. It has been followed in equity cases as well as in law cases, [citing many cases]." (p. 269. See, also, *Andrews v. Glidden,* 122 Kan. 291, 293, 251 Pac. 1978.)

When the question is raised that there is no competent, substantial evidence to support a finding of the trial court, this court will examine the evidence to determine that question. Except in one or two minor particulars it is not seriously contended that there is no substantial, competent evidence to support the findings of the court in this case. We have examined the evidence abstracted and find

nothing material in the findings which is not supported by competent, substantial evidence. Upon the main question in the case, whether the Big Slough through section 7 was a natural watercourse, as found by the trial court, there is an abundance of competent evidence to support the finding made. The geological survey made by the federal government in 1888, the survey made by the engineer of the drainage district at the time of the organization of the district, and later surveys showing the elevation and contour lines of section 7, all accord with the court's findings. The parol testimony on the question was conflicting. Much of it accords with the findings of the court. It is the function of the trial court to weigh this conflict, and its findings upon this question are binding on this court.

It was the theory of defendants, and they had some testimony tending to support it, that the Big Slough entered section 7 from the west and proceeded in a northeasterly course to near the center of the section, as contended by plaintiff, but that instead of running thence east, as contended by plaintiff and found by the court, its course turned near the center of section 7 to the southeast and toward the Cowskin, and that the dikes built by the officers of the drainage district are on the north and the east bank of the Big Slough. Defendants further contend that what is known as the Little Slough enters section 7 from the north about 80 rods west of the northeast corner of the section and proceeds in a course almost due south to the middle line of the section, thence southeast, and leaving section 7 about 100 rods north of the southeast corner. For the purpose of illustrating their testimony on this point and their argument in this court in support of it, they have filed in this court an illustrative map for their brief. This map was not introduced in evidence nor considered by the trial court. Appellee objects to the filing of this map and to its consideration by this court. There is no objection to a party presenting with his brief in this court any map, plat or drawing illustrative of his argument, even though such map, plat or drawing was not introduced in evidence nor considered by the trial court. It should, of course, be made to appear clearly that such map or plat drawing is used only for illustrative purposes and as a part of the argument and brief of the party, and that was done in this case.

It was brought out in the evidence of the case that in times of extraordinary floods, any dikes or ditches made by defendants were

State, *ex rel.,* v. Riverside Drainage District.

insufficient to control the water; that the water spread out two or three miles wide, covering all the land several feet. . Appellants argue that it is useless to have an injunction for the reason that an injunction cannot stop or control such flood. But this is rather beside the point. Perhaps nothing that has been done in the way of building dikes or making ditches, or that is feasible to do, would be adequate to control such water. But this fact would not justify the defendant drainage district in placing a dike across a natural watercourse and diverting the waters which would flow through such watercourse in times of ordinary rains and freshets away from such natural watercourse and on lands of others outside of the drainage district, when they have procured no authority to do so, and to the injury of the public and to the damage of the rights of those outside of the drainage district.

On behalf of the individual defendants, in addition to the matters previously discussed, it is contended that there is no finding of the court which justifies a judgment against them. We find no answer to this contention. The trial court found that the drainage district constructed the dikes across the natural watercourse of the Big Slough and made the ditches which are complained of. There is no finding that the individual defendants erected such dikes or constructed such ditches, or had any part in doing so. When a trial court is asked to make findings of fact and conclusions of law, he should find all facts shown by the evidence upon which the judgment rendered is based. (*Snodgrass v. Carlson,* 117 Kan. 353, 232 Pac. 241, and cases there cited.)

There being no findings to support the judgment as against these individual defendants, that portion of the judgment will be reversed. The judgment against the defendant drainage district and its officers is affirmed.