No. 45,031

FREDERICK W. MANN, *Appellee,* and *Cross-Appellant,* v. TATGE CHEMICAL CO., INC., GILMORE & TATGE MANUFACTURING CO., INC., HARLAN H. TATGE, and MERWIN W. GILMORE, *Appellants.*

(440 P. 2d 640)

Opinion filed May 11, 1968.

*Robert Martin,* of Wichita, argued the cause, and *George B. Collins, K. W. Pringle, Jr., William F. Schell, Robert M. Collins, William L. Oliver, Jr., William V. Crank,* and *Tom C. Triplett,* all of Wichita, *C. Vincent Jones* and *Wayne W. Ryan,* both of Clay Center, and *Thomas M. Burns* and *Peter J. Wall,* both of Denver, Colorado, were with him on the briefs for the appellants.

*William P. Thompson,* of Wichita, argued the cause, and *John H. Widdowson, A. W. Hershberger, Richard Jones, H. E. Jones, Jerome E. Jones, Robert J. Roth, William R. Smith, Robert J. O'Connor,* and *Greer Gsell,* all of Wichita, were with him on the briefs for the appellee and cross-appellant.

The opinion of the court was delivered by

KAUL, J.: This is an action for damages arising out of an alleged misappropriation of trade secrets. The trial court rendered judgment in favor of plaintiff on the issue of liability. The question of damages, by agreement of the parties, was reserved for further determination. The appellants have appealed from the judgment

and plaintiff has cross-appealed for the limited purpose of clarification of the judgment.

The plaintiff resides at Waterville, Kansas, and his principal occupation is farming. The Gilmore & Tatge Manufacturing Co., Inc., is a light manufacturing firm, principally engaged in the business of fabricating farm implements and livestock feeders and oilers. Its place of business is at Clay Center. The Tatge Chemical Co., Inc., is a jobber and distributor for the manfacturing company and its principal place of business is at Herington. The appellant Harlan H. Tatge is a resident of Herington and appellant Merwin W. Gilmore is a resident of Clay Center. Tatge is president and a director of corporate appellants. Gilmore is an officer, director, and general manager of Gilmore & Tatge Manufacturing Co., Inc. For convenience the appellants will be referred to collectively as defendants.

In the late summer or early fall of 1961, plaintiff first thought of an idea to combat the face fly problem. The problem concerned the disease of pinkeye, which is spread among cattle by an insect commonly called a face fly. Plaintiff conceived the idea of a hood, with an insecticide applicator, suspended over a salt block. In the ensuing months plaintiff constructed a device incorporating his idea. He first built a three legged framework out of old pipe and suspended an old poultry brooder stove hood over a salt block to test his idea with cattle. After various experiments, in adjusting the height of the hood, he determined that cattle would put their heads under the hood to reach the salt block. Later in the winter, probably the latter part of December, plaintiff commenced construction of a working model which he completed on March 10, 1962. The completed model consisted of three supporting legs, equally spaced from one another at the bottom, extending upward and then inward toward each other for about ten feet and were joined together at a central point, directly above the center of a triangle, formed by the bottoms of the three supporting members or legs.

Plaintiff and his wife first cut a pattern for the hood out of newspapers. The hood was then formed out of galvanized tin and an insecticide reservoir was bolted and soldered into the top of the hood on the inner or underside thereof. On the underside of the hood he affixed two tubes or conduits to opposite sides of the hood. The tubes extended into the reservoir tank at a point above the insecticide level, then were affixed to the underside of the hood extending downward to the base. He bought coal oil lamp wicks

at a hardware store, sewed them together into an elongated strip or rope, to be utilized as wicks. The long wicks were inserted through the tubes or conduits so that the upper end of each wick extended out of the upper ends of the conduits, down into the insecticide. The wicks ran down through the conduits to the base of the hood, where each wick was clipped to the base of the hood in a half circle so that together they formed an applicator ring extending completely around the perimeter of the base of the hood. A salt box or feed container was attached to the legs by three supporting arms extending from the legs inward to the container. The hood was suspended from the supporting frame by three chains so that the base of the hood, with the applicator wick or ring attached, was a few inches above the salt container and in such a manner that cattle could not reach the salt unless their faces contacted the applicator ring.

Simultaneously, plaintiff, with the help of his wife, prepared a patent application, which was filed on March 13, 1962.

Plaintiff's brother, Paul, who operated a feed store in Waterville, knew of defendants' manufacturing company in Clay Center and told his brother about it. Paul called a friend, Paul Williams, an employee of the Key Milling Company in Clay Center, and asked if he would take plaintiff to the plant of Gilmore & Tatge Co. Plaintiff went to Clay Center on March 24, 1962, where, through Paul Williams, he met John McKee, manager of the Key Milling Co., and a stockholder of Gilmore & Tatge Co. McKee took plaintiff and his wife over to defendants' plant where they met Gilmore and Tatge. Plaintiff informed them that he had an insecticide applicator to fight face flies and was interested in having defendants manufacture it on a royalty basis. Plaintiff described his device in detail and showed defendants the drawings attached to his patent application. Gilmore and Tatge looked at plaintiff's drawings and papers and Tatge told plaintiff that if he had something defendants could use they would definitely be interested. Defendants inquired of plaintiff if he had a working model, and arrangements were then made for defendants to look at it at plaintiff's father-in-law's farm.

While at defendants' plant, plaintiff was shown a face fly fighter, in combination with a cattle oiler, that defendants had developed and put on the market in 1961. Defendants' applicator utilized a wicking process in applying insecticide to a flap or a curtain suspended by an arm above or next to a salt or feed container, the insecticide wicked only into the top of the curtain. The defendants

claim the model shown plaintiff was a later one with an absorbent roll attached to the bottom of the curtain but not directly attached to the wick.

Two days later, on March 26, 1962, defendants, Tatge and Gilmore, drove to the farm of plaintiff's father-in-law and inspected plaintiff's working model. Defendants told plaintiff they did not believe it could be adapted to their present upright stand. Plaintiff suggested that an arm could be extended out from the center pole to hold the hood above the salt, in the same manner as the arm that holds the present flap or applicator on defendants' model. The conversation was interrupted by the arrival of plaintiff's brother and no further comment was made except defendants, immediately before leaving, stated that if they decided to use plaintiff's idea they would let him know.

About a week later, on April 3, 1962, the defendants finished construction of their model now in controversy. It consists of a metal hood, 36 inches in diameter, containing an insecticide reservoir with a curtain or heavy canvas hanging from the base of the hood to within a few inches above a feed or salt container. A wick applicator, which was kept in a round form by a steel ring, was attached around the bottom of the canvas curtain. A centrally located pole supported the hood and feed container. The insecticide is wicked from a reservoir in a metal hood through a conduit, affixed to the inner-side of the metal hood, extending to the curtain and the applicator wick on the bottom of the curtain. The mineral feed or salt box is positioned beneath the curtain and is affixed to the centrally located pole, or stand, which passes through the center of the box.

In May 1962 the Gilmore & Tatge device was advertised in a Kansas Farmer journal and described as the "New TOX-O-WICK COMBINATION FACE FLY FIGHTER and MINERAL FEEDER with Positive Face Fly Control." The advertisement also contained a picture and description of some of the features of the device.

Plaintiff saw the advertisement and in June returned to defendants' factory and inquired why he was not being paid a royalty for the use of his ideas. Gilmore told plaintiff that they had changed the device sufficiently so that they did not consider plaintiff entitled to anything. Gilmore also accused plaintiff of using their wicking idea and of infringing on defendants. Plaintiff further testified he was "dumbfounded" and left. Plaintiff returned to the factory in in September 1962 and again asked why he was not getting anything

for his hood idea. Gilmore advised plaintiff that Tatge was overseas and when he returned they would try to make a settlement. At this conference, Gilmore showed plaintiff a copy of a patent policy agreement promulgated by the International Harvester Company. The agreement purports to be an acknowledgment of a limitation on the establishment of a confidential relationship with respect to one submitting ideas for possible use by the company. Gilmore suggested plaintiff sign a similar agreement with defendants. Plaintiff refused.

Plaintiff next returned to defendants' factory at the request of defendants in January 1963. On this occasion, Tatge again accused plaintiff of infringing and then offered to settle by permitting plaintiff to use the wicking idea if plaintiff would forget about his demands on defendants.

There were no other communications between the parties until this action was commenced.

Plaintiff states three causes of action in his petition. His first cause alleges a tortious misappropriation of trade secrets. His second cause alleges breach of an oral contract that if they commenced the manufacturing and sale of a combination insecticide applicator, defendants would so advise plaintiff and impliedly agreed to pay plaintiff a reasonable royalty. In his third cause of action, plaintiff alleges the acts of defendants were committed willfully, wrongfully, and maliciously with wanton disregard for the rights of plaintiff and prayed for punitive or exemplary damages.

In their answer to plaintiff's petition, defendants admit plaintiff approached them in an attempt to interest them in manufacturing and marketing a form of insecticide applicator, but deny that plaintiff's device was new or novel or that it was appropriated by them.

Plaintiff was issued a patent on his device on June 2, 1964. Defendants filed an application for a patent on their device in issue on October 23, 1962, and a patent was issued to them on June 8, 1965.

At the trial, and in this appeal, plaintiff claims his patent covers the basic concept of a combination of elements making up a hood type applicator and that defendants' patent covers only improvements to the basic structure patented to plaintiff.

A pretrial conference was held on October 8, 1965, at which the parties agreed upon the principal issues of fact and law to be determined, and that the trial should be had by the court without

a jury on all issues of liability, set out in the three counts of the petition, and that the question of damages would be reserved for trial on a subsequent date. The parties also agreed to a stipulation of facts, including a stipulation that defendants sold 6,765 combination units, encompassing defendants' hood type applicator, during the period of time from May 1962 to April 1964, and during the same period of time defendants sold 915 of their original flap and/or curtain type applicator.

Our discussion of the issues raised on appeal will require frequent references to the findings and conclusions of the trial court; omitting findings Nos. 1 and 2, dealing with jurisdiction and identification of the parties, they read as follows:

"Findings of Fact

"3. During July, 1961, the defendants marketed a curtain type insecticide applicator to fight cattle face flies. (Exhibits: Plaintiff's 12—Defendant's B.)

"4. In the fall of 1961, plaintiff conceived the idea of building a device to apply insecticides to the face of cattle. (Exhibits: Plaintiff's 1 through 5.) Said device consisted of the following elements:

"(a) An upright support consisting of three members.

"(b) A bin-like container for feed mounted on the support in spaced relation to the ground.

"(c) A liquid absorbent ring member mounted by the support in a horizontal plane adjacent and around the bin with all portions of the absorbent member spaced outwardly from the bin and with the ring member free to move laterally.

"(d) A liquid reservoir for insecticide mounted on the support, and

"(e) A conduit for a wick communicating between the insecticide reservoir and the absorbent ring member.

"5. On March 24, 1962, plaintiff with his wife met with the defendants Tatge and Gilmore in the offices of Gilmore-Tatge Company in Clay Center. The plaintiff informed the defendants of his device and his desire to have them manufacture the same 'on a royalty basis.' Plaintiff showed the defendants a copy of his application for a patent and explained its operation. At said time defendants showed plaintiff a display model of their face fly fighter. (Defendants' Exhibit B.)

"One of the defendants told plaintiff that if his device was new or novel and could be used by them, they would negotiate with him for the device on a royalty basis or on any other basis the parties saw fit.

"6. On March 26, 1962, the defendants went to plaintiff's farm and viewed the working model.

"7. The viewing of plaintiff's device accelerated defendants' prior art. (Exhibits: Defendants' B and Defendants' E.)

"8. The individual components of plaintiff's device were known to defendants with the exception of conduit to the wick applicator.

"9. The combination of elements of plaintiff's device was not in the public domain.

"10. Plaintiff's disclosure to defendants of his device was made in expectation of monetary remuneration.

"11. The disclosure created a confidential relationship between the defendants and the plaintiff.

"12. The defendants made and sold a face fly insecticide applicator which incorporated the conduit idea of plaintiff, and viewing plaintiff's device accelerated defendants' prior art so that they could produce a working model by April 3, 1962.

"13. The plaintiff has not been compensated for the use made by his device by defendants, and plaintiff has been damaged thereby.

"Conclusions of Law

"1. Plaintiff's combination of components totaling his device was not known to the public at large or to the industry generally.

"2. The plaintiff disclosed his device under circumstances which indicate that the defendant accepted them in confidence.

"3. The plaintiff disclosed his device to defendants, who were aware of the fact they were receiving the information in confidence, and that the information was to be paid for.

"4. The court, realizing that a confidential relationship does not of necessity give rise to an implied contract, concludes from the conversation of the parties that an implied contract exists as to any use made by defendants of plaintiff's device or any part thereof.

"5. Defendants have been unjustly enriched by virtue of the confidential relationship with plaintiff.

"6. Plaintiff is not entitled to recover exemplary damages.

"7. Plaintiff is entitled to damages, said damages to be determined at a subsequent trial.

"8. Defendants' motion to dismiss is overruled.

"9. Costs taxed to defendants."

In ruling on posttrial motions finding No. 9 was stricken by the trial court probably because it was duplicated by conclusion of law No. 1.

The basic issue is whether there is substantial evidence in the record to support the trial court's findings.

In an action such as this, essentially plaintiff must establish (1) a confidential relationship between the parties; (2) disclosures by plaintiff to defendant of what amounts to a trade secret, and (3) a use of those disclosures by defendant. (Vol. 4 Restatement of the Law of Torts, § 757; *Speedry Chemical Products, Inc., v. Carter's Ink Company*, 306 F. 2d 328 [2nd Cir. 1962]; *Heyman v. AR. Winarick, Inc.*, 325 F. 2d 584 [2nd Cir. 1963], 9 A. L. R. 3d pp. 652, 666.)

In this case defendants raise issues pertaining to all three requirements. We shall discuss them in the order stated.

Was a confidential relationship between the parties developed

by the facts and circumstances surrounding their dealings in this case? While the record discloses no evidence that plaintiffs extracted an express promise of trust from defendants when he showed them his drawings and patent application, and later his working model, the defendants certainly knew plaintiff was not making a gift of his creation. Defendants knew plaintiff had applied for a patent; they knew plaintiff expected compensation if his ideas were used. Under such circumstances, disclosure gives rise to a confidential relationship. An express agreement is not a prerequisite. (*Heyman v. AR. Winarick, Inc.*, supra; *Speedry Chemical Products, Inc., v. Carter's Ink Company,* supra.) A confidential relationship will be implied where parties are a seller and a prospective purchaser and disclosures about the subject of the sale are of such a nature as to otherwise qualify as a trade secret. (*Heyman v. AR. Winarick, Inc.*, supra; *Schreyer v. Casco Products Corp.*, 190 F. 2d 921 [2nd Cir. 1951], cert. den. 342 U. S. 913, 96 L. Ed. 683, 72 S. Ct. 360; *Hoeltke v. C. M. Kemp Mfg. Co.*, 80 F. 2d 912 [4th Cir. 1935].) We believe the evidence pertaining to the negotiations of the parties in the instant case manifestly supports the trial court's finding that a confidential relationship was established.

Defendants argue that before a confidential relationship is created, the disclosing party must prove that what he disclosed was novel or a trade secret and not something known to the other party or to the industry. Defendants claim plaintiff's proof failed to meet the requirement.

At this point, we pause to examine the definitional problem of what constitutes a trade secret. A general treatment of the subject is found in Vol. 4 Restatement of the Law of Torts § 757, Comment (*b*), as follows:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. . . ." (p. 5.)

Within the same comment, however, problems in arriving at a precise definition are pointed out. It is said:

". . . An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the informa-

tion; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." (p. 5.)

We find no cases and are cited to none, in which this court has specifically defined a trade secret. However, it has long been recognized in this jurisdiction that a property right exists in trade secrets or in information in one's possession which would benefit another party on disclosure. (*Mayfield v. Hesston Mfg. Co.*, 187 Kan. 91, 353 P. 2d 789; *Miller v. International Harvester Co.*, 179 Kan. 711, 298 P. 2d 279; *Ballard v. Claude Drilling Co.*, 149 Kan. 506, 88 P. 2d 1021; *Southwest Specialties Co. v. Eastman,* 130 Kan. 443, 286 Pac. 225; *Morrison v. Woodbury,* 105 Kan. 617, 185 Pac. 735.)

The application of specific definitional factors to the facts of the instant case will be considered as we proceed with discussion of the issues raised.

Defendants argue the trial court's finding No. 8 is contrary to the evidence and clearly erroneous. Defendants construe finding No. 8 to mean that since all of plaintiff's individual components were known to defendants, except the conduit to the wick applicator, and since plaintiff concedes a wicking device to have long been in the public domain, and further since they had previously used a wick in conduit process, then nothing unknown or novel was disclosed by plaintiff to them.

The trial court found plaintiff's device consisted of five elements, as set out in finding No. 4. According to finding No. 8 all were known to defendants with the exception of the conduit to the wick applicator. In conclusion No. 1 the trial court states that plaintiff's combination of components totaling his device was not known to the public or the industry generally. Finding No. 8, standing alone, might lend support for defendants' position. However, by reading findings Nos. 4 and 8 together with conclusion No. 1, it is made clear that it is not the conduit to the wick applicator, as such, but rather its utilization in combination with the four other components, set out in finding No. 4, that comprises the novelty and was unknown to defendants or the public.

A trade secret can exist in a combination of components, each of which, by itself, might be in the public domain. A knowledge of the best combination of processes or systems of combination of elements may amount to a trade secret. (*Imperial Chem. Indus. Ltd. v. National Distillers & Chem. Corp.*, 342 F. 2d 737 [2nd Cir. 1965], modified on the basis of new findings of fact on remand 354

F. 2d 459 [2nd Cir. 1965]; *Head Ski Company v. Kam Ski Company,* 158 F. Supp. 919; *Allen Mfg. Co. v. Loika,* 145 Conn. 509, 144 A. 2d 306; *Ferroline Corp. v. General Aniline & Film Corp.,* 207 F. 2d 912 [7th Cir. 1953], cert. den. 347 U. S. 593, 98 L. Ed. 1098, 74 S. Ct. 678, reh. den. 347 U. S. 979, 98 L. Ed. 1118, 74 S. Ct. 784.) It has been held that a mere advancement or improvement of an old product is a trade secret. (*Ranger Steel Products Corp. v. Chodak,* 128 N. Y. S. 2d 607; *Franke v. Wiltschek,* 209 F. 2d 493 [2nd Cir. 1953].) A trade secret may consist of information which will advance or accelerate the development of a competitor's product. (*Engelhard Industries, Inc. v. Research Instrumental Corp.,* 324 F. 2d 347 [9th Cir. 1963].)

The trial court's finding in conclusion No. 1 that plaintiff's combination of components, totaling his device, was not known to the public or to the industry, was labeled a conclusion of law. However, the fact that the trial court saw fit to call it a conclusion of law does not detract from its potency as a finding of fact. (*Attebery v. Griffin Construction Co.,* 181 Kan. 450, 312 P. 2d 598; *Raynes v. Riss & Co.,* 152 Kan. 383, 103 P. 2d 818.) The finding is supported by evidence. Gilmore admitted that an examination of plaintiff's combination of elements hastened the development of defendants' product. Use of plaintiff's device by defendants may be inferred from defendant Tatge's admission that a settlement was offered whereby defendants could use the "hood idea" and plaintiff could use the "wick idea."

The fact that defendants may have had some prior art, consisting of their engineer Bishop's drawings of the flat top hood and half curtain design, is not a defense, where the viewing of plaintiff's device accelerated defendants' prior art, as found by the trial court in finding No. 7. Where a device or process is not so widely known as to be within the public domain, prior art is not a defense where there is a breach of confidence. (*Head Ski Company v. Kam Ski Company,* supra; *Franke v. Wiltschek,* supra; *Futurecraft Corp. v. Clary Corp.,* 205 Cal. App. 2d 279, 23 Cal. Rptr. 198.)

Defendants point out that in several of their products, and in particular a hog oiler, they had utilized a wicking process for the movement of insecticides from a reservoir to an applicating material by capillary action in which the wick was enclosed in a conduit. Plaintiff concedes there is nothing new or novel about a wicking process, or even in utilizing a wick enclosed in a conduit. It is plaintiff's position that defendants had never seen or used a wick

in a conduit device in combination with other elements and utilized in a manner such as that devised by plaintiff until they saw plaintiff's working model.

As we have indicated, defendants saw plaintiff's working model on March 26, 1962, two days after plaintiff first visited the defendants' plant on March 24, 1962. These dates are the critical times with respect to the developmental status of defendants' device in question.

When plaintiff visited defendants' plant he was shown only their flap type "Tox-O-Wick Face Fly Fighter" which they had marketed for sometime. Plaintiff claims the device he saw was a loose flap applicator with insecticide only wicked to the top of the flap by a wick roll extending across the top of the flap or curtain. Defendants claim plaintiff saw their newer flap device with an absorbent roll attached to the bottom of the curtain to prevent excess insecticide from dripping on the salt and to stabilize the flap from moving in the wind. The point is not relevant since there is no claim of wicking to the bottom of the flap, the principle involved in the two devices in controversy.

Defendants' evidence shows that prior to this time they had conducted considerable experimentation in attempting to develop a more adaptable and efficient process for the application of face fly insecticide. Jerald W. Bishop, an engineer and an employee of the defendants at the time in question, testified that he had worked on the project off and on for a period, possibly of six months, extending into the early months of 1962. He testified that he had constructed a flat-topped hood device, one-half the vertical surface of which was constructed of metal and the other half enclosed with a curtain device. He thought this device was that represented by the drawings shown in defendants' Exhibit "E." Bishop testified that he had learned of a device such as plaintiff's in a conversation with Gilmore, although he didn't remember any reference to Mann's name. He testified that Gilmore described a structure embodying the general features of plaintiff's device although he thought Gilmore described the hood as being suspended by chains from a tree limb. Bishop was a reluctant witness, and his testimony on direct examination was somewhat evasive. He admitted that, prior to the conversation with Gilmore, he had failed in constructing a device that consistently brought insecticide into contact with the faces of cattle and at the same time protected the

salt from the elements without contaminating the salt with drippings of insecticide from the applicator.

After Bishop's conversation with Gilmore, a working model of defendants' conical shaped hood type applicator was constructed. The testimony of Bishop, and the specific admission of Gilmore, that the viewing of plaintiff's working model hastened the development of defendants' device, is sufficient to support the trial court's finding No. 12 (*i. e.*, the viewing of plaintiff's device accelerated defendant's prior art so that they could produce a working model by April 3, 1962).

Confidential disclosures, which result in the development and marketing of a new product substantially sooner than could have been accomplished without the information disclosed, give rise to a claim for damages. (*Schreyer v. Casco Products Corp.*, supra; *Engelhard Industries, Inc. v. Research Instrumental Corp.*, supra.) Furthermore, the similarity between the elements of and principles involved in the two devices is persuasive evidence that one was copied from the other. (*Hoeltke v. C. M. Kemp Mfg. Co.*, supra; *Smith v. Dravo Corp.*, 203 F. 2d 369 [7th Cir. 1953]; *International Industries v. Warren Petroleum Corp.*, 99 F. Supp. 907 [subsequently affirmed as to finding of fact but reversed as to amount of damages, 248 F. 2d 696 (3rd Cir. 1957)].)

Defendants contend that plaintiff took little precaution in keeping his device a secret—to the extent that it was disclosed to the public and therefore in the public domain. In support of their position they cite *Aktiebolaget Bofors v. United States*, 93 F. Supp., 131; *Skoog v. McCray Refrigerator Co.*, 211 F. 2d 254 (7th Cir. 1954).

It is true plaintiff disclosed some information to his brother, Paul, and to Williams and McKee for the limited purpose of establishing contact with defendants. Plaintiff never offered to sell his device nor did he permit anyone to use it before disclosing it to defendants. Obviously, plaintiff's limited disclosure to a relative and a few friends does not constitute a dedication to the public. (See *Ungar Electric Tools, Inc. v. Sid Ungar Co., Inc.*, 192 Cal. App. 2d 398, 13 Cal. Rptr. 268; *Peabody & others, executors, v. Norfolk & another*, 98 Mass. 452.)

The *Bofors* case merely held a complaint alleging wrongful use of a product in violation of a licensing agreement did not state a cause of action under the Federal Tort Claims Act. The *Skoog*

case involved a general disclosure to the public. Neither case is in point with the issue here.

Defendants further contend plaintiff's idea or device was not in concrete form or subject to practical application when disclosed to defendants. The contention is not supported by the evidence. Plaintiff had finished his working model and it was being tested at his father-in-law's farm. His patent application was on file. Plaintiff's disclosure was much more than an abstract plan described in *Plus Promotions, Inc., v. RCA Mfg. Co., Inc.*, 49 F. Supp., 116, cited by defendants. Defendants also cite *Smoley v. New Jersey Zinc Co.*, 24 F. Supp., 294, in which the disclosures were held insufficient. In the *Smoley* case the disclosure was incomplete and there were no drawings or a working model involved. Neither case is in point with the facts in the case at bar.

Applying the general principles, which have been recited to the instant case, we conclude the facts and circumstances disclosed by the record fully support the trial court's determinations that a confidential relationship was entered into by the parties with respect to the disclosures made by plaintiff; that such disclosures fell within the classification of a trade secret, and that defendants made use of them in the development of their device.

Defendants assert several trial errors which require our brief attention.

Defendants complain of error by the trial court in not admitting two exhibits offered by them. The exhibits were a picture of a cattle oiler and a drawing of a hog oiler, previously developed by defendants and were offered for the purpose of establishing that defendants had originated and marketed products utilizing a conduit wicking device. Plaintiff conceded defendants were using such a wicking system, therefore, the exhibits at most were only cumulative. Refusal to admit them under such circumstances does not amount to prejudicial error.

Defendants further complain the trial court erred in admitting plaintiff's patent for the limited purpose of showing what plaintiff disclosed to defendants on his first visit to defendants' factory, when he showed the patent application to defendants. Since plaintiff testified he showed the application to defendants the patent was admissible for the limited purpose of which it was offered.

Defendants also claim plaintiff's counsel exceeded the limited purpose for which the patent was admitted by reading from it in

closing argument. We have examined the excerpt abstracted from the closing argument and find defendants' complaint to be inconsequential. We also note the absence of objection by defendants at the time.

We find no error requiring reversal as to any issues raised by defendants in their statement of points on appeal.

Plaintiff has perfected a cross-appeal for the declared limited purpose of modifying and clarifying the findings of the trial court. We have examined the points raised by the cross-appeal, with respect to the court's findings, and though in some instances the language used by the court might have been more explicit, we find no error which could be said to affect a substantial right of the result of the litigation. Technical errors are to be disregarded, and error, in order to be grounds for reversal, must be such as to affect the substantial rights of the parties. (2A West's Kansas Digest, Appeal & Error, § 1027; 1 Hatcher's Kansas Digest [Rev. Ed.], Appeal & Error, § 509.) Such being the case we shall not burden this opinion with further discussion of those points.

Two other points raised by plaintiff's cross-appeal deserve brief comment. He complains of conclusion No. 6 in which the trial court denied recovery of exemplary damages. The short answer to this question is that the trial court found no facts which would support an award of exemplary damages. Ordinarily, evidence of fraud, oppression or wanton disregard of rights, is essential to support an award of exemplary damages. (*Atkinson v. Herington Cattle Co., Inc.,* 200 Kan. 298, 436 P. 2d 816; *Chessman v. Felt,* 92 Kan. 688, 142 Pac. 285.) We find no evidence in the record that would warrant a change in the trial court's ruling in this regard.

Finally, plaintiff suggests that language setting out more specific guidelines for the allowance of damages be substituted for conclusion No. 7 which reads:

"Plaintiff is entitled to damages, said damages to be determined at a subsequent trial."

Compliance with plaintiff's suggestion might be of some benefit to the parties, however, in the absence of a ruling by the trial court, there is no reviewable issue on appeal. (*Home Finance Corporation v. Cox,* 190 Kan. 553, 376 P. 2d 884; *Young v. Barker,* 185 Kan. 246, 342 P. 2d 150.)

The judgment is affirmed with respect to the appeal and the cross-appeal.