No. 50,936

KOCH ENGINEERING COMPANY, INC., *Appellee and Cross-Appellant,* v. WAYNE C. FAULCONER and FAULCON ENGINEERING, *Appellant and Cross-Appellee.*

(610 P.2d 1094)

Opinion filed May 10, 1980.

*Thomas A. Wood,* of Wichita, argued the cause and was on the briefs for the appellant and cross-appellee.

*Robert L. Howard,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause and was on the briefs for the appellee and cross-appellant.

The opinion of the court was delivered by

FROMME, J.: This is an action seeking a permanent injunction

against the misuse of trade secrets and the misappropriation of protectable proprietary rights under exclusive license agreements. An injunction was granted. The defendant, Wayne C. Faulconer, appeals, saying no injunction should have been granted. The plaintiff, Koch Engineering Company, Inc., cross-appeals, saying the injunction was not broad enough. The defendant, Faulconer, contends on appeal that plaintiff, Koch, failed to establish that plaintiff used or possessed protectable trade secrets or protectable proprietary rights under exclusive license agreements. The following background facts are not in dispute and are taken from the court's findings.

Koch entered into an exclusive licensing agreement with Sulzer Brothers, Ltd., Winterthur, Switzerland, hereinafter referred to as Sulzer. By the agreement dated July 3, 1967, and supplemental amendments thereto, Koch obtained exclusive manufacturing and sales rights to certain Sulzer packings and other products in the United States, Canada and Mexico. The license agreement is for an initial period of 15 years, and grants Koch certain rights of renewal. Sulzer packing is a crimped, perforated wire cloth and is arranged in alternating layers for application within distillation or fractionation columns or towers.

Distillation, or fractionation, is an operation used to separate different chemicals by their boiling points. This is normally accomplished in a tower, or column, containing devices of differing designs to mix the vapor and liquid. The lightest material (lowest boiling point) comes off the top of the tower as a vapor. The heaviest material (highest boiling point) is removed as a liquid out the bottom of the tower. Intermediate materials, if they are present, can be taken off at various positions up the tower corresponding to their boiling temperature. The same sort of fractional separation can be accomplished by a series of towers where the first one is used to remove the lightest material out the top, with everything else going out the bottom to the next tower where the next lightest material is taken out overhead, and so forth.

The diameter size of the rectification tower is determined by the vapor and liquid flows and the capacity of the packing device inside the tower. The height of the tower is dependent upon the efficiency, often referred to as height equivalent to a theoretical plate of the device used inside the tower. Koch-Sulzer packing is

among the most efficient devices now used commercially for separating chemicals. Koch-Sulzer packing is a woven-wire gauze material which spreads out the liquid to a fine film by capillary action thus improving the opportunity for the lower boiling chemical to be vaporized out of the higher boiling liquid and taken out of the tower. The Koch-Sulzer packing consists of crimped layers of this specially chosen mesh wire which are placed side by side, but with reversed inclined corrugation angles. As the vapors pass up through these triangular shaped channels the vapor in one layer is constantly being sheared and mixed with the vapor in the adjacent layer. This action provides superior vapor composition mixing and intimate contact with the liquid film so that any heavy material in the vapor can be cooled and condensed into the liquid containing material of the same or lower boiling point. Because Koch-Sulzer packing does such an efficient job of maintaining gas-liquid contact, it has a very low height equivalent to a theoretical plate when compared to other devices and therefore less tower height is required. The intimate mixing characteristic and the relatively large open area of Koch-Sulzer packing also give it more relative capacity for vapor and liquid flow so a tower utilizing it can be smaller in diameter than one with another type of packing.

The higher the pressure inside a tower, the higher the temperature must be to vaporize a certain chemical material. A great many chemicals are affected by high temperature which causes decomposition and undesired coloring of the material. Koch-Sulzer packing is a very low pressure-drop device which means that the temperature of the liquid in the bottom of the tower can be lower while the temperature in the top is the same as a tower with another device which has a higher pressure drop. The low liquid retention in Koch-Sulzer, because of the thin film effect, also aids in preventing degradation because the liquid is not subjected to the inside temperature for as long a time.

Sulzer packing and the equipment for the manufacture thereof were developed by Dr. Max Huber, a Swiss chemical engineer, while he was director of the laboratory for process engineering of Sulzer Brothers. Dr. Huber is now assistant vice-president of Sulzer Brothers, an internationally-known industrial firm. After experiments with approximately ten different configurations over a six month period in 1961, the present arrangement was found to

be most effective on a small scale. However, it was not until 1965 that a final design was developed which would operate on an industrial scale. The first large scale application of Sulzer packing for a distillation column was not in operation until the end of 1966.

The machinery for crimping the wire cloth packing was also developed over a substantial period of time, beginning with a hand press to make each crimp and ending with a hydraulic crimper with an automatic forwarding mechanism. Numerous problems were encountered with the feed mechanism because the wire cloth must be fed into the machine at an angle. Also, because of the elasticity of the wire cloth, the die had to be designed to crimp at a sharper angle than the resulting angle in the wire cloth. Additional experimentation was necessary to determine the best perforating configuration for the cloth.

Sulzer Brothers had invested approximately $5,000,000 in research, development and testing of the packing, distillation columns, and related items. The licensing agreement required Koch to make an initial payment to Sulzer of approximately $20,000 for initial technology transmitted and during the term of the license agreement, Koch has made over $1,000,000 in additional royalty payments to Sulzer for exclusive license rights and for additional technology transmitted under the agreement. Eight hundred thousand dollars of the royalty payments are directly attributable to sales of packing and related items.

By the terms of the Koch-Sulzer license agreement, and as a part of the consideration therefor, it is expressly recognized that the information, technical data, and documents made available to Koch by Sulzer are confidential in nature and that any disclosure thereof might be harmful to Sulzer. The agreement provides that the rights granted Koch are personal to it and Koch is specifically prohibited from ceding, assigning, mortgaging, charging or transferring any rights thereunder. Koch expressly agreed that it would hold all information, technical data and documents obtained from Sulzer in confidence and safeguard the same and to cause its employees to do likewise.

Defendant Wayne Faulconer was first employed by plaintiff Koch on September 13, 1971, as a process engineer with particular responsibility for Sulzer packing. In said capacity, and solely by virtue of his position with plaintiff, defendant Wayne Faul-

coner obtained access to and knowledge of confidential Sulzer manuals, progress reports, blueprints, drawings, specifications and patent information.

Faulconer had no written employment agreement with Koch. Faulconer had obtained a BS degree in chemical engineering from Kansas State University in 1968, and had graduate credits from the University of Michigan in mathematical modeling and in distillation and mass transfer.

Before going to work for Koch, Faulconer was employed as a process engineer by Dow Chemical Company doing column and plant design. He worked with a chemical used in making 2-4D and methoxyflurane. He worked for Dow a little less than three years. Thereafter he worked less than one year for Hooker Chemical Company as a design engineer, working with Koch-Sulzer packing used in distillation of chemicals.

From the time he was initially employed by plaintiff, the defendant's general sphere of work related to Koch-Sulzer packings. The first thing the defendant did for plaintiff upon his employment was to write a test report on a pilot plant test and defendant immediately started designing columns for Koch employing Koch-Sulzer packing. His supervisor was Peter Reich. When defendant was first employed at Koch, Koch had sold only 88 jobs employing Sulzer packing. By the time defendant's employment terminated, 512 jobs had been sold.

Koch never asked Faulconer to sign a secrecy or confidentiality agreement but on October 17, 1976, Koch and Faulconer signed an agreement whereby in consideration of annual payments by Koch, Faulconer agreed he would not for five years from the termination of employment with Koch, either take part in any competing profession or business, or himself enter into such competition.

Sulzer technology was made available to certain professional employees of Koch, such as Wayne Faulconer, on a "need-to-know" basis because of the company's trust and confidence in them and because of their professional training and status. The responsibility of employees not to disclose confidential information or use it for their own personal interests was stated as an express condition of continued employment in a conflict of interest memorandum distributed to key Koch employees under date of January 9, 1975. Beginning in May, 1977, all new em-

ployees of Koch were required to sign a patent and confidential information agreement. Defendant Faulconer was not required to sign same because he had been an employee for six years.

Many documents pertaining to Sulzer technology which were delivered to defendant Faulconer contained restrictive notices of confidentiality. The following are taken from the court's findings.

"a. Sulzer Design Manual — 'This information is intended for the personal use of Wayne C. Faulconer, Master Copy and remains our property. The contents are to be regarded as confidential and not to be communicated to third parties.'

"b. Sulzer Handbook, EV-40 — 'This report is confidential! It must never leave the premises of the company and is to be kept under lock. If you advise customers, do not tell all the reasons why.

"Most of the everyday needed information is contained in the handbook. Each person needing this information should have a personal copy of the handbook, which should be taken along on trips. The contents as a whole is confidential too.'

"c. Chemical Separations Index, EV-50 — 'This index is confidential. Under no circumstances must it be shown to customers or used for publicity.'

"d. Sulzer Test Report — 'Confidential. This report is the property of Sulzer Brothers Limited, Winterthur, and being private and confidential is supplied on the express condition that it is not to be used for any purpose or copied or communicated to any other person without our written permission.'

"e. All Sulzer Blueprints — 'The copyright of this drawing which was entrusted to the receiver personally belongs to our company. Without the written permission of Sulzer this drawing shall not be copied or in another way duplicated nor given to third persons or made available in another way to third persons.' The legend on these blueprints is in German.

"f. Most Koch Blueprints — 'Note — The information contained hereon is of a confidential nature and is the property of Koch Engineering Company, Inc., Wichita, Kansas, U.S.A. and shall not be traced, photographed, photostated or reproduced in any manner, nor used for any purpose whatever except by written permission of Koch Engineering Company, Inc.'

"Some Koch blueprints contain the notation or legend, 'Issue to Koch Shop only.' "

Pursuant to the license agreement, Sulzer had made available to Koch confidential technical information, data, blueprints, equipment and various other documents to enable Koch to commence the manufacture and sale of Sulzer packing, which packing is utilized in rectification towers or columns for distillation of chemicals. Said confidential information obtained and utilized by Koch in the manufacture and sale of Koch-Sulzer packing, together with further information developed by Koch in regard to

customers, marketing information and the manufacture of packing, constitutes a valuable asset used by Koch in the course of its business. Sulzer packing is highly efficient; it can be scaled up easily to large column sizes, and its performance characteristics have been tested by Sulzer and have experienced industry acceptance. From 1968 to 1976, sales of Sulzer packing by Koch went from $200,000 to $4,500,000.

Defendant Faulconer was aware of the confidential nature of some of the information concerning the design and manufacture of Sulzer packing. He was furnished with various test reports, Sulzer manuals and documents which were expressly marked confidential.

Detailed technology concerning design and manufacture of Sulzer packing is available from diverse public sources. The defendant obtained some of the knowledge he now seeks to use from those sources. The evidence discloses at least the following instances wherein Faulconer accumulated Koch-Sulzer technology directly from his position as an employee of Koch:

(1) Faulconer succeeded Peter Reich, a former Sulzer employee, as the designated custodian of Sulzer technology reports at Koch and when Reich left Koch, Faulconer "inherited" Reich's files.

(2) Faulconer was sent to Winterthur, Switzerland, in 1976 by Koch and while at the Sulzer Brothers' facility, Faulconer received new copies of Sulzer Progress Reports for the years 1969 to 1976, and an up to date copy of the Sulzer Design Manual from Dr. Huber, in order to insure that Faulconer had a complete set of Sulzer materials.

Defendant Wayne Faulconer first used the name "Faulcon Engineering" in the spring of 1977. In the fall of 1977, he used that name for various contacts to develop his so-called Faulcon packing. On November 7, 1977, defendant Faulconer contacted one of plaintiff's suppliers of stainless steel wire cloth, Kansai Wire Netting Co., Ltd. Wire cloth is the essential component in Sulzer packing, and defendant Faulconer was, by the above letter, seeking a quote for 25,000 lineal feet of said cloth. The specifications provided by defendant Faulconer were virtually identical to those used by Koch in the manufacture of Sulzer packing. By a subsequent letter, defendant Faulconer advised Kansai that his inquiry was for "a new business venture" and that

"we wish to maintain all aspects of the inquiry in the strictest of confidence."

In late 1977 and early 1978, Faulconer contacted other suppliers of wire cloth. In each instance, the specifications provided were virtually identical to those used by plaintiff in the manufacture of Sulzer packing, with the exception of a minor additional requirement not related to performance characteristics. Further, as a means of illustration, Faulconer provided the various suppliers with actual samples of wire cloth which Koch was using in the manufacture of Sulzer packing.

A unique characteristic of Sulzer packing is the angle by which the wire cloth is crimped. Sulzer provided Koch with a machine to accomplish the crimping and Koch also had blueprints and specifications for a Sulzer crimping machine. Koch also had a crimping machine custom-built by Master Kraft Tooling Corporation, Tulsa, Oklahoma, by utilizing photographs and measurements of the Sulzer crimper.

Defendant Faulconer was aware that plaintiff had its crimping machine manufactured by Master Kraft Tooling Corporation. He contacted Mr. Abernathy of Master Kraft to obtain a quote to build a crimping machine like the one previously built for Koch. Thereafter, defendant went to Abernathy at Master Kraft in Tulsa to discuss construction of a crimping machine. Faulconer personally delivered to Abernathy a set of Sulzer blueprints for the crimping machine.

Upon delivery of the Sulzer blueprints, defendant Faulconer advised Mr. Abernathy that he wanted a crimping machine built like the blueprints. Defendant went over the Sulzer blueprints and noted some minor changes, but otherwise the machine to be built was to be identical to Koch's. At no time did defendant Faulconer ever instruct Mr. Abernathy that the crimping machine was to be built any differently from the blueprints or from that previously built for Koch. Abernathy quoted defendant a price for building the crimping machine.

The machine used by Koch for crimping the wire cloth is unique and must be custom built. Mr. Abernathy has been in the business of custom building machine tools for 16 years, attends trade shows and is familiar with machine tool manufacturers' catalog offerings. He had never seen a machine technically identical to the Koch-Sulzer crimper. The feeding mechanism is

intricate and when Master Kraft built a crimper for Koch it required various adjustments to function properly.

When Master Kraft built the machine for Koch, it had the benefit of pictures and the opportunity to inspect and take precise measurements from the original Sulzer machine. Even so, Mr. Abernathy had a great deal of difficulty in completing it. Without the blueprints and the availability of another duplicate machine, it would be very difficult and expensive for someone else to build a similar machine.

In December, 1977, Faulconer placed an order with Norlan Ferguson, Eureka, Kansas, for the manufacture of a crimping machine. The drawings provided Ferguson for the construction of a crimping machine were substantially identical to the ones used by Koch. Ferguson was instructed to make the angle and depth of crimp as close as possible to the specifications in the drawings he was given, and those specifications were, in all significant respects, identical to those of the Koch crimper. The machine built was based on those drawings, although Ferguson deviated from them. A sample of the Koch wire cloth which Faulconer had obtained and which was run through the Ferguson machine produced a crimped result identical to that used by Koch.

In February, 1978, Faulconer contacted Allen Welding to obtain a quote on a spot welder that would weld wire mesh around Faulcon packing. Allen had sold a Miller welder to Koch and suggested a Miller welder to Faulconer. Faulconer also provided Allen Welding with a piece of wire cloth taken from Koch as an illustration of what he would be welding. Thereafter, Faulconer also contacted Lampton Welding to secure a quote on a spot welder and defendant provided Lampton with a sample of Koch's wire cloth to determine if the welder would perform as required.

In early 1978 while employed at Koch, Faulconer made written proposals to Grant Chemical Company and to Charles Bopp to furnish them with Faulcon packing. Bopp and Grant Chemical were customers of Koch and Faulconer had dealt with them in his capacity as an employee of Koch. Faulconer told Grant Chemical that his packing would possess the technical properties of Koch packing at a price one-third less. Neither proposal was accepted.

In making his proposal to Mr. Bopp, defendant used an original Koch sepia drawing of a flange which he had taken from Koch,

obliterated the Koch title block and confidentiality notation, and then made some changes in the parts' dimensions and configurations by overdrawing on the reverse side.

All of the above actions were taken while defendant Faulconer was still a full-time employee of plaintiff. On learning of some of defendant's actions in late February and early March, 1978, Koch terminated defendant's employment.

Immediately after his termination, defendant contacted various Koch customers to offer his packing for sale. Each company which defendant contacted were customers of plaintiff which defendant had called on for plaintiff. In a letter to Dow Chemical Company, defendant specifically claimed that his packing would meet or exceed the performance of that of Koch-Sulzer and that the physical configurations would be nearly identical.

The documentary evidence obtained from defendant's own files shows a clear pattern of actual business activity by Faulconer, commencing in October, 1977, while still a Koch employee, and culminating in Faulconer's bids to Grant Chemical and Charles Bopp.

The defendant introduced evidence that Dr. Huber of Sulzer had written and published various articles in trade magazines concerning Sulzer columns and packings explaining the advantages of the system and main properties thereof. The purpose of this evidence was to show that the Sulzer system was in the public domain. The wire cloth used in the Koch-Sulzer packing is a standard manufactured item and was not developed by Sulzer. The specifications for crimping the wire cloth to form the corrugation and the inclination thereof may be learned by studying the finished packing. The court found there was nothing secret about the application of the packing, the column design, column tolerances, internals, installation in towers or pricing practices and policies. It appeared from the evidence that various types of packing, such as ceramic, plastic, flexipac, and mixer, are being used in other systems but that Sulzer research indicated the wire cloth packing used in the Koch-Sulzer system was superior.

In final summarization of the evidence the trial court found:

"In summary, but not in limitation, all of the information necessary to manufacture Koch-Sulzer packing is in the public domain. The knowledge of the best combination of processes or systems of combination of elements amounts to a trade secret in this case.

"The combination is not widely known outside the plaintiff's business or by

employees within the business. The plaintiff has taken reasonable means to guard the secrecy of the information which is valuable to the plaintiff and to its competitors.

"It would be extremely difficult, time-consuming, and expensive for anyone to duplicate the Koch-Sulzer process by utilizing the information that is in the public domain if that person had to find the information for himself. The ability of the defendant to avail himself of the vast resources of the plaintiff and Sulzer Brothers accelerated his ability to produce a product virtually identical to the plaintiff's."

In granting the injunction the trial court in its original order effective February 8, 1979, stated:

"For clarity, and in order to insure the protection of the trade secrets of plaintiff, the defendant is permanently enjoined from directly or indirectly manufacturing or designing packing and/or distillation towers which utilize a substantial duplication of Koch-Sulzer BX or CY packing.

"The defendant is further ordered to remove the die, the feed mechanism, and the take-off assembly from the machine owned by defendant and to forthwith deliver said die, feed mechanism, and the take-off assembly to plaintiff."

An appeal was then taken by defendant. Plaintiff filed a cross-appeal. While the appeal and cross-appeal were pending Faulconer continued his efforts to establish his distillation packing business. On February 12, 1979, he wrote to Allied Chemical Company stating that the trial court's decision had left the scope of his present packing business unrestricted. On February 19, 1979, he wrote to G. Valeri of Union Carbide Company stating that under the court's decision he could undertake any business activity he wished. Between February and June of 1979, Faulconer contacted various potential customers including Fiber Industries, Inc., Dow Chemical and Artisan Industries for possible sales of "Faulcon Packing." On August 30, 1979, Faulconer shipped twenty elements of Faulcon packing to Artisan Industries.

On September 19, 1979, Koch obtained an order directing Faulconer to appear and show cause on a motion for supplemental relief. On September 26, while the matter was pending, Faulcon packing was shipped to Dow Chemical of Freeport, Texas. After various motions and objections by Faulconer he was held in contempt of the February 8th order to deliver the die, feed mechanism, and take-off assembly. This occurred on October 10 and on that same day Faulconer shipped Faulcon packing to Fabrication Engineering Service Co., Inc., in connection with a sale to Fiber Industries, Inc. Faulconer continued to contact

customers during the month of October. On November 16, 1979, the court granted supplemental permanent injunctive relief after a hearing at which it made additional findings and conclusions substantially as follows:

1. Koch-Sulzer packing is the only commercially produced packing that utilizes woven wire gauze, crimped, arranged in reverse corrugated layers, with the wire gauze containing perforations of varying patterns, and assembled in the configurations or variation of configurations as shown by the various exhibits in evidence labeled Sulzer or Koch-Sulzer packing.

2. The research, testing, experimentation, and technology concerning each configuration is part of the trade secret as found in the original Journal Entry of Judgment. This technology is not only essential to the design, manufacture, and application of Faulcon packing, it is necessary to the so-called test reports used by Faulcon packing.

3. Faulcon packing attains the same basic result that is attained by Koch-Sulzer packing, uses the same means of attaining the result as does Koch-Sulzer packing, and uses the same manner in which the different parts of the packing operate and cooperate to produce the result as does Koch-Sulzer packing.

4. Each Koch-Sulzer packing described by the six parameters is a substantial duplicate of the other.

5. Faulcon packing is a substantial duplicate of Koch-Sulzer "BX" and/or "CY" packing.

6. Based upon the trial court's comparison of defendant's "Faulcon Packing Performance" report and defendant's "May 1979 Experimental Study," with plaintiff's Fractionation Research, Inc. (FRI) Plant Test Report, and based upon the similarity between the reports in language and basic tabulated data, including the chemicals tested, the size of the columns, and the pressures at which the chemicals were tested, and further based upon defendant's admission that he has never run any of the tests that defendant's documents purport to display or report, the trial court found that defendant's reports had been basically copied from the FRI report. Nothing in defendant's reports make it apparent, even to a graduate chemical engineer, that defendant did not in fact run the tests on which the reports are based. Defendant's reports do, however, convey the idea that Faulcon packing, as purportedly tested, performs in substantially the same

manner as Koch-Sulzer packing, and that the applications or uses of Faulcon packing duplicate or are interchangeable with Koch-Sulzer packing. The trial court, therefore, found that defendant distributed his reports in an attempt to palm off Faulcon packing as a substantial duplicate of Koch-Sulzer packing.

7. Defendant, Wayne C. Faulconer, designed and manufactured a packing known as "Faulcon packing" which is a substantial duplicate of Koch-Sulzer BX or CY packing, and which is virtually a direct copy of Koch-Sulzer AX packing. In designing and manufacturing Faulcon packing defendant has continued to misappropriate the trade secret technology transferred from Sulzer to Koch pursuant to the Koch-Sulzer License Agreement.

8. The court's prior injunction prohibited the defendant from utilizing plaintiff's trade secrets by substantially duplicating BX and CY packing. The trial court at the supplemental hearing further found that Faulcon packing is a substantial duplicate of Koch-Sulzer BX, CY, AX, and BW packing and all other packings of the petitioner, and the manufacture of same is a violation of the original injunction.

As a result of these additional findings the court's supplemental injunction against Faulconer enjoined him permanently from directly or indirectly:

"a. Utilizing all or any portion of the design, specifications, technique, or methods used by the plaintiff or Sulzer Brothers, Ltd., in designing or assembling any type of Koch-Sulzer packing elements both in the cylindrical and segmental configurations;

"b. Utilizing in any manner any drawings, documents, test data, monographs, correspondence, papers, technical data, or information concerning the Koch-Sulzer product line and/or Koch-Sulzer packing and/or equipment previously identified in the evidence in the hearings herein as part of the compilation of Koch-Sulzer technology;

"c. Disclosing or transmitting in any manner to any firm, person, or corporation any technical data, information, or documents pertaining to the design, manufacture, or sale of the Koch-Sulzer product line;

"d. Assembling, manufacturing, offering for sale, selling, or delivering any product, packings, or equipment acquired by the defendant or in the process of being assembled, manufactured, or sold by defendant which in any manner incorporates any of the compilation of Koch-Sulzer technology which has previously been found by this Court to constitute a trade secret.

"e. Designing, manufacturing, or assembling any packing or distillation tower that utilizes a substantial duplicate of any Koch-Sulzer packing or distillation tower."

Faulconer perfected an appeal from this second supplemental

injunction questioning the authority of the court and the validity of the supplemental injunctive order.

We turn now to the issues raised in the two appeals in light of some of the controlling law in the area of trade secrets and unfair competition.

In an action to enjoin unfair competition arising by reason of the unauthorized use of a trade secret, the plaintiff must establish (1) the existence of a trade secret used by plaintiff in its business or trade, (2) a confidential relationship between the parties, (3) disclosures made in confidence by plaintiff to defendant concerning the trade secret, and (4) an unauthorized use of those disclosures by the defendant. *Mann v. Tatge Chemical Co., Inc.,* 201 Kan. 326, 332, 440 P.2d 640 (1968); Restatement of Torts § 757 (1939).

The threshold issue in every case is not whether there was a confidential relationship and a breach of contract or some other kind of misappropriation, but whether, in fact, there was a trade secret to be misappropriated. So we must answer the primary question — What is a trade secret? A trade secret has an intangible pecuniary value. It may relate to a single item of information, a plan or compilation of information, or a combination of ideas and tangible expressions, such as drawings, patterns, devices, plans, notes and lists with which to put the item, plan or compilation to use. 2 Callmann, Unfair Competition Trademarks and Monopolies § 51.1 (3d ed. 1968 and 1979 Supp.).

In *Mann v. Tatge Chemical Co., Inc.,* 201 Kan. at 333, quoting from the Restatement, it is pointed out an exact definition of a trade secret may not be possible, but factors to be considered in recognizing a trade secret are: (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.,* by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information. See also *Abbott Laboratories v. Norse Chemical Corp.,* 33 Wis. 2d 445, 147 N.W.2d 529 (1967).

In *Mann v. Tatge Chemical Co., Inc.,* 201 Kan. at 334, we state

that no cases in Kansas have provided a definition for a trade secret, but the following cases involving trade secrets are cited: *Mayfield v. Hesston Mfg. Co.,* 187 Kan. 91, 353 P.2d 789 (1960); *Miller v. International Harvester Co.,* 179 Kan. 711, 298 P.2d 279 (1956); *Ballard v. Claude Drilling Co.,* 149 Kan. 506, 88 P.2d 1021 (1939); *Southwest Specialties Co. v. Eastman,* 130 Kan. 443, 286 Pac. 225 (1930); *Morrison v. Woodbury,* 105 Kan. 617, 185 Pac. 735 (1919). A statement as to what a trade secret may consist of can be found in *Mann,* 201 Kan. at 333, as quoted from Restatement of Torts § 757, Comment *b*:

> " 'A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. . . .' (p. 5.)"

Let us examine the factors to be considered in determining whether a trade secret exists in the present case. The process we are to examine consists of a combination of devices and a compilation of information which, when operated, assembled, and made use of in a certain manner, can result in the construction of a distillation plant with internal packings which obtain an advantage over competitors.

First, to what extent was the information known outside the business? The process in general was known by those who had seen the components of the Koch-Sulzer distillation process but the methods, research information, patents and machines which were necessary to produce the types of packing were unique and intricate. They were not generally known outside the business of Koch-Sulzer.

Second, to what extent was it known to those employees inside the business? The employees were acquainted with the process to varying degrees and certain key individuals had access to confidential blueprints, books and manuals in which the process was completely explained. The blueprints of the crimping machine were available to Faulconer and others but were understood to be confidential.

Third, what precautions were taken by the holder of the trade secret? The books and manuals obtained from Sulzer and placed in the hands of Faulconer and other key employees were marked confidential. Most of the employees were required to sign secrecy agreements.

Fourth, what savings were effected and what was the value to the holder in having the information as against competitors? Koch entered into an exclusive licensing agreement with Sulzer Brothers, Ltd., Winterthur, Switzerland, to obtain exclusive manufacturing and sales rights to the Sulzer packings. Koch made a down payment of $20,000 and has paid over $1,000,000 in royalty payments for continued rights.

Fifth, what amount of effort or money was expended in obtaining and developing the information? Sulzer invested $5,000,000 in research, development and testing which resulted in valuable technology. The licensing agreement required Koch to keep the technical data confidential and to safeguard the same. In addition Koch had financed a trip by Faulconer to Winterthur, Switzerland, to attend a training session on later developments by Sulzer in the field of distillation technology.

Sixth, what amount of time and expense would it take for others to acquire and duplicate the information? Sulzer Brothers, Ltd., had worked on perfecting this process from 1961 to 1965. Faulconer worked for Koch using the confidential materials from 1971 to 1977, before he began developing his business venture. There was no evidence of the amount of expense it would take for others to acquire and duplicate the information. The only evidence available was the amount Koch paid to obtain the exclusive licensing agreement.

Considering the above factors the trial court correctly determined from the evidence that Koch was using and was legally in possession of a valuable trade secret which consisted of patterns, devices and a compilation of information obtained through extensive research which was used in its business in manufacturing and selling Koch-Sulzer packings, and which gave Koch an advantage over competitors who did not use it. There can be little question that a confidential relationship existed between Koch, as employer, and Faulconer, as employee. Disclosures were made in confidence by Koch concerning the trade secret. Manuals, documents and blueprints were marked and understood to be confidential. Faulconer, in spite of having signed an agreement not to compete, made unauthorized use of the confidential disclosures, set up his own competing business and persisted in manufacturing and selling a packing which was practically identical to the Koch-Sulzer packing.

It is little wonder that Faulconer was able to underbid Koch-Sulzer packing, for Koch was required by the licensing agreement with Sulzer to pay royalty on all Koch-Sulzer packing sold; Faulconer was not. In addition, Faulconer had copied not only the packing but also the research data, which was a valuable sales tool. The research data clearly established the superiority of wire cloth crimped packing over other types of packing. Faulconer had no research expense to recoup; Koch-Sulzer did.

The evidence introduced in this case clearly supported the court's findings, and the findings in turn supported the court's conclusion that a permanent injunction should be issued.

Turning now to the supplemental appeal, it appears there is one primary question which, when answered, will determine all others. The question concerns the authority of the court to supplement and enlarge its original order granting injunctive relief.

The appellant Faulconer continues to deny that a trade secret existed. Based on that premise he argues the issuance of the permanent injunction and the enlargement thereof was erroneous. We disagree. We have discussed the issuance of the permanent injunction and nothing further need be said thereon. However, appellant questions the power and authority of the trial court to enlarge and supplement its injunction once the order has been entered.

A district court clearly has both a statutory and an inherent power in Kansas to enforce its orders. K.S.A. 60-909 provides that a court may enforce an injunction by (1) contempt, (2) damages, and (3) other appropriate remedies. K.S.A. 60-910 outlines the procedure for vacating or modifying an injunctive order both before and after final judgment. As far back as *State v. Pittsburg*, 80 Kan. 710, 104 Pac. 847 (1909), this court recognized the inherent and indisputable power of a district court to punish those who violate its injunctive orders. In *Campbell v. Campbell*, 198 Kan. 181, 194, 422 P.2d 932 (1967), this inherent power is recognized in the following words:

"[I]t perhaps should be emphasized that nothing herein is to be taken in diminution of the inherent power of the district court to punish for contempt and to make such reasonable orders as are necessary to preserve and protect its judgment if a litigant maintains a position at variance with that judgment."

Even if a court issues an erroneous order, the parties to the litigation must obey the order when it was within the court's

jurisdiction, and, for the sake of orderly administration of justice, any disobedience with that order may be punished as contempt. *Small v. Small,* 195 Kan. 531, 534, 407 P.2d 491 (1965).

The proper manner for a party to test the validity of an order of a court is not to defy the order, but to move to have it set aside in the court which issued it or in some court having supervisory jurisdiction. When a permanent injunction has been issued, the court issuing the same is empowered to enforce both the letter and the spirit, or purpose, of the injunction and should do so at the request of the party who obtained the injunction. As stated in 11 Wright & Miller, Federal Practice and Procedure: Civil § 2961, p. 600 (1973):

"Inasmuch as an injunctive decree is drafted in light of what the court believes will be the future course of events, a court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to insure that the decree accomplishes its intended result."

A trial court has the jurisdiction, the authority, and the power not only to enforce its orders but also to entertain a motion for supplemental relief and to issue appropriate additional orders to make effective the relief previously granted. See *State, ex rel., v. Riverside Drainage District,* 123 Kan. 46, 254 Pac. 366, *rehearing denied* 123 Kan. 393, 255 Pac. 37 (1927); *State, ex rel., v. Riverside Drainage District,* 129 Kan. 150, 155, 281 Pac. 881 (1929); *Brookings v. Riverside Drainage Dist.,* 135 Kan. 234, 235, 9 P.2d 656 (1932).

One final matter raised in the supplemental appeal merits comment. Appellant quotes K.S.A. 60-906 which states that every order granting an injunction shall set forth the reasons for its issuance, shall be specific in terms, and shall describe in reasonable detail the acts sought to be restrained. On the basis of this statute appellant questions the sufficiency of the court's order because it refers to "thousands of pages of exhibits." The first order consisted of 32 pages of facts found and conclusions reached. The supplemental order consisted of seven additional pages of facts found and conclusions reached. All but seven of the thirty-nine pages set forth the findings with reasons for the issuance of the orders. The remaining seven (7) pages describe in reasonable detail the acts sought to be restrained as heretofore quoted.

In these orders it was noted:

"[T]he defendant is permanently enjoined from directly or indirectly manufacturing or designing packing and/or distillation towers which utilize a substantial duplication of Koch-Sulzer BX or CY packing.

"The defendant is further ordered to remove the die, the feed mechanism, and the take-off assembly from the machine owned by defendant and to forthwith deliver said die, feed mechanism, and take-off assembly to plaintiff."

This describes in reasonable detail the acts sought to be restrained in the first order of the court. The supplemental order as previously quoted herein extended the injunction to Faulcon packing which is a substantial duplicate of Koch-Sulzer AX and BW packing, in addition to the BX and CY packing previously covered. The supplemental order was more specific and covered the prohibitions imposed by the injunction in more detail.

Reading the two orders together there is little doubt that they fully advised appellant of the prohibited acts and complied with the provisions of K.S.A. 60-906.

Now we turn to the cross-appeal of Koch, filed in the original appeal of Faulconer. The first issue raised was directed at the trial court's failure to enjoin Faulconer from duplicating the entire line of Koch-Sulzer packing. This was done by the court in its supplemental order and no further mention was made of it by cross-appellant. Accordingly the matter complained of by Koch was disposed of in the supplemental order in Koch's favor, and now is approved and affirmed by this court.

The second issue raised on the cross-appeal concerns failure of the trial court to enjoin Faulconer from soliciting customers of Koch. We see little purpose for the trial court to extend the injunction to solicitation of customers, since Faulconer is enjoined from manufacturing, offering for sale, selling or delivering the products. The trial court found the list of customers of the plaintiff was not a trade secret. Both parties have acquiesced in the court's findings and this ends the question. Whether a particular customer list is a trade secret depends on the facts and circumstances of each case, and is a question of fact for the trier of fact. Here the court found against the cross-appellant and the finding must stand.

By way of illustration we have two cases in Kansas which involved the use of customer lists. In *Morrison v. Woodbury,* 105 Kan. 617, the court enjoined the use of a customer list. In *Garst v. Scott,* 114 Kan. 676, 220 Pac. 277, 34 A.L.R. 395 (1923), the court held the solicitation of laundry customers of a former employer

should not be enjoined. The determination in each case is one of fact. For those who would like to explore the subject further see Annot., Customer List—As Trade Secret—Factors 28 A.L.R.3d 7.

The judgment of the court is affirmed on appeal and on cross-appeal.