NOT DESIGNATED FOR PUBLICATION

No. 118,807

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

ALAN E. SOUTH,
*Appellee*,

and

GRACE ANN STOUT SOUTH,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed December 21, 2018. Affirmed.

*T. Bradley Manson*, of Manson Karbank McClaflin, of Overland Park, for appellant.

*Jessica A.B. White* and *G. Peter Bunn III*, of Feree, Bunn, Rundberg & Ridgway, Chartered, of Overland Park, for appellee.

Before MALONE, P.J., PIERRON, J., and BURGESS, S.J.

PER CURIAM: This is the second appeal in the divorce of Alan E. South and Grace Ann Stout South. The parties had a premarital agreement covering the division of their property in the event of a divorce. The district court entered an original judgment addressing the division of the parties' property in accordance with this agreement. Grace appealed. On review, this court affirmed, but remanded for the district court to determine

1

Grace's liability for the parties' 2014 income tax. *In re Marriage of South*, No. 114,846, 2017 WL 840233 (Kan. App. 2017) (unpublished opinion) (*South I*).

On remand, the district court determined the dollar amount of Grace's tax liability. But Alan also moved to have the district court determine the dollar amount of the parties' marital property awards. After the district court entered judgment on this motion, Grace moved to alter or amend the judgment, arguing the district court had exceeded the scope of the remand. The district court denied her motion, finding it had jurisdiction to determine the amount of the parties' marital property awards. Grace appeals the district court's judgments on both motions.

This appeal mainly deals with Grace and Alan's premarital agreement. That agreement identified several categories of property. The agreement's provisions on marital property are relevant to this appeal. The agreement defined marital property as "[p]roperty that is acquired by the parties during the marriage and not jointly titled or deemed Separate Property." In case of a divorce after more than 60 months of marriage, the agreement provided that Grace would receive the greater of $500,000 or one-half the net fair market value of the marital property. The agreement defined net fair market value as "the fair market value of the Marital Property at the termination of the marriage, less debt secured thereby."

After almost 6 years of marriage, Alan petitioned for divorce. The district court held a trial in April 2015. Before trial, Grace and Alan agreed on an exclusive list of property they had acquired during their marriage. Along with other property not relevant to this appeal, this list included (1) a vacation home in Sanibel, Florida; (2) stock in Alan's law firm, SouthLaw, PC; (3) a golf club membership; (4) a yacht club membership; (5) a 2013 Jeep Wrangler; and (6) a 1956 Chevrolet Corvette. The parties agreed that Grace would receive the yacht club membership, Alan would receive the stock, and they would sell the rest of the items. The parties also agreed the Wrangler was

2

marital property, but they disputed whether the other items were marital or joint property. They disputed whether Grace was liable for the parties' 2014 federal and state income taxes.

After the trial, the district court entered a divorce decree. The court later entered a judgment on the division of Grace and Alan's property. It held that the Sanibel home, the stock, the club memberships, and the Corvette were all marital property. Because the Sanibel home had not sold yet, the court entered judgment on how the proceeds from the sale would be distributed. The proceeds would be used to pay the outstanding mortgage, closing costs, and to reimburse Alan for carrying costs, as well as several other expenses. The court found: "The parties agree that the net proceeds from the sale of the Sanibel property, after accounting for whichever expenses the Court deems appropriate, shall be divided in accordance with the parties' Agreement." It also held that Grace was liable for part of the parties' 2014 income taxes, but it determined no specific dollar amount. Grace appealed the court's judgment.

While the appeal was pending, the Sanibel home sold. According to the United State Department of Housing and Urban Development (HUD) Settlement Statement, the home sold for a contract sales price of $2,500,000. Grace and Alan's mortgage debt on the home was $1,557,771.05. The parties were also responsible for $177,182.39 in settlement charges and $20,000 in escrow for repairs to the home. The settlement charges included sale costs such as the broker's commission, property taxes, and title insurance.

According to the HUD Settlement Statement, the net proceeds from the sale were $748,711.99. This amount was deposited in a trust account. Grace and Alan also received refunds from their mortgage carrier, title company, and insurance carriers after closing. These refunds were also deposited into the trust account.

3

After the Sanibel home sold, but while the appeal was still pending, Grace and Alan also entered an agreement addressing several property items as well as reimbursements. The agreement was memorialized in a letter signed by counsel for both parties. The parties agreed that Alan would receive $275,000 from the trust account as reimbursement for carrying costs as explained in the district court's judgment. While the district court had found no proceeds should be used to reimburse Grace, the parties still agreed that Grace would receive $5,000 from the trust account to cover any claim she may have for reimbursement. As for the other property items, the parties agreed Alan would buy the Wrangler and the Corvette, and each party would receive half of the sale price. The parties also agreed to divide the refunds evenly.

The *South I* court affirmed the district court's finding that the Sanibel home, the Corvette, and the club memberships were all marital property. 2017 WL 840233, at *8-9. The court also affirmed the district court's holding that Grace was liable for part of the couple's 2014 income tax and remanded for the district court to determine the exact dollar amount of Grace's tax liability. 2017 WL 840233, at *9-11.

In *South I*, Grace argued for the first time on appeal that assigning any of the debt to her violated the premarital agreement. She asserted the agreement guaranteed she receive at least $500,000. She contended that holding her liable for the tax debt would reduce her award in violation of this guarantee.

The *South I* court rejected her argument, holding the premarital agreement contained no provision on the allocation of the parties' general debts and liabilities. Because the agreement did not govern the parties' debts and liabilities, the district court could apportion them in any way that was fair, just, and equitable to the parties. 2017 WL 840233, at *12. The court went on to hold:

"The district court can apportion the parties' 2014 income tax liability without violating the terms of the premarital agreement; the agreement does not 'guarantee' that Grace will receive $500,000 or half the fair market value of the marital property *after taking into account* the entirety of the district court's property division. Instead, the premarital agreement simply provides that in the event of a divorce, Grace will receive a certain amount of the marital property depending on the length of the marriage. However, there is nothing in the premarital agreement that indicates that Grace cannot also be ordered to pay any portion of parties' debt, even if this would effectively reduce the total amount of assets she is awarded in the divorce. Grace is asking the district court to add terms to the premarital agreement that are not found therein. We conclude there is no merit to Grace's argument that allocating a portion of the parties' 2014 income tax liability to her violates the terms of the premarital agreement." 2017 WL 840233, at *12.

Judge Arnold-Burger concurred in part, but she dissented from the majority's holding that Grace's tax liability could be subtracted from her marital property award. Judge Arnold-Burger reasoned: "[T]o the extent that the contract incorporates the general meaning of the term net, which means the amount of the total value remaining after the deduction of expenses or liabilities, then the premarital contract did provide for the treatment of marital debt." 2017 WL 840233, at *13. Judge Arnold-Burger also noted that under her interpretation of the plain language of the agreement, "the $500,000 was clearly a failsafe amount." 2017 WL 840233, at *13. As a result, the district court should not be able to reduce Grace's $500,000 lump sum payment by her tax liability. 2017 WL 840233, at *13.

Grace filed no petition for review in *South I.* On remand, the district court denied Grace's request for additional discovery. The court found that *South I* did not suggest the evidence was insufficient to determine her tax liability. The district court then ordered the parties to submit briefs and limited briefing to Grace's tax liability. The district court ultimately held that Grace was liable to reimburse Alan for $68,669 worth of income tax that Alan had already paid.

5

Grace moved to alter or amend judgment. She argued *South I* erred in finding the premarital agreement did not guarantee she should receive at least $500,000. She urged the district court to adopt the reasoning in Judge Arnold-Burger's dissent. The court denied her motion.

Alan also filed a "Motion to Reconcile Division of Marital Property and Enforce the Previous Orders of the Court." He explained that the parties had sold all their marital property and the proceeds were being held in a trust account. But the parties could not agree how to divide the money. He argued that according to the premarital agreement, the parties should calculate the fair market value of all the marital property and subtract the amount paid to close the mortgage. The remaining amount would be the net fair market value of the marital property. That amount should be divided in half and allocated to each party. Additional adjustments should then be made to account for the home's sale costs, and any refunds and reimbursements. According to his calculations, Grace would receive $243,999.38, and he would receive $286,537.38.

In response, Grace argued that the adjustments for sale costs, refunds, and reimbursements should be accounted for before dividing the property in half. Doing the calculation this way would make half the value of the marital property less than $500,000. Under the premarital agreement, she would then receive $500,000 from the division of marital property. After subtracting her tax liability and what she had already received, she would receive $356, 251.

After hearing oral argument, the district court entered judgment adopting Alan's reasoning and calculations. To calculate the marital property's net fair market value, the court subtracted the amount used to pay the Sanibel home's mortgage, $1,557,771.05, from its sales price, $2,500,000, leaving $942,228.95. The court then added these amounts:

6

| | |
|---|---|
| $942,228.95 | Sanibel home's net fair market value |
| $100,000 | SouthLaw, PC Preferred Stock |
| $45,760.02 | Sanctuary Gold Club Membership |
| $5,200 | Captiva Island Yacht Club |
| $29,000 | 2013 Jeep Wrangler |
| $65,000 | 1956 Chevrolet Corvette |
| $1,187,188.97 | Marital property's net fair market value |

The court divided the marital property's net fair market value, $1,187,188.97, in half, resulting in $593,594.49 each to Grace and Alan. Because this amount was more than $500,000, the court continued to use it in the calculations.

Next, the court totaled these adjustments:

| | |
|---|---|
| $31,861.95 | Items paid by seller in advance (Lines 406-411 of HUD Settlement Statement) |
| $24,479.57 | Refund of escrow account funds from Sanibel home |
| $5,152.64 | Refund of homeowner's insurance premium |
| $2,996.94 | Refund of flood insurance premium |
| $1,009.20 | Interest from accounts holding proceeds of Sanibel home |
| ($197,192.50) | Reductions in amount due to seller (Lines 502, 506, and 507 of HUD Settlement Statement) |
| ($275,000) | Reimbursement to Alan for carrying costs and other expenses |
| ($5,000) | Reimbursement to Grace |
| -$411,692.20 | Value of adjustments |

The district court then divided the value of the adjustments in half and applied the amount to each party's award, resulting in $387,748.39 going to each party. The court then subtracted $75,080.01 from Grace's share for assets and funds she had already received. The court also subtracted $68,669 for Grace's tax liability. This resulted in an award of $243,999.38 for Grace.

Several weeks later, Grace moved to alter or amend the judgment. She argued the district court lacked jurisdiction to apply the adjustments for sale costs, refunds, and reimbursements. She asserted the court was limited to determining the amount of her tax liability on remand. She reasoned the court exceeded the scope of the remand in applying the adjustments to the marital property division, and it thus lacked jurisdiction to do so.

After hearing oral argument, the district court again denied Grace's motion. The district court held it had jurisdiction to apply the adjustments. The court found *South I* did not rule on the issue explicitly or by necessary implication. The court also found consideration of the adjustments was essential to carrying out the mandate, and none of its orders were contrary to the mandate. Grace appeals.

*Value of Marital Property*

First, Grace argues the district court erred in calculating the value of her marital property award. While the marital property division includes other items, the main point of contention is how to divide the proceeds from the Sanibel home. Grace claims the Sanibel home's net fair market value equals the net proceeds from its sale. She accuses Alan of trying to inflate the home's net fair market value by making deductions for sale costs and reimbursements later in the property division.

Alan responds that Grace conflates the determination of net fair market value with the allocation of net proceeds. According to Alan, the net fair market value of the Sanibel

8

home is the sales price minus their mortgage debt. All other adjustments must be made later in the property division.

A district court's division of property in a divorce action is governed by K.S.A. 2017 Supp. 23-2801 et seq. The standard of review is abuse of discretion. *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002); *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 715, 229 P.3d 1187 (2010). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.,* 302 Kan. 66, 74, 350 P.3d 1071 (2015).

Resolution of this issue also requires interpretation of the parties' premarital agreement. A premarital agreement is a contract subject to the same rules as any other contract. *In re Marriage of Cutler*, No. 103,148, 2011 WL 1877703, at *4 (Kan. App. 2011) (unpublished opinion). We exercise unlimited review over the interpretation and legal effect of written contracts. We are not bound by the district court's interpretation. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). Any mistake of law in interpreting the contract would constitute an abuse of the district court's discretion. See *In re Estate of Einsel*, 304 Kan. 567, 579, 374 P.3d 612 (2016) (noting any mistake of law in interpreting earlier divorce decree would be abuse of discretion).

"The primary rule for interpreting written contracts is to ascertain the parties' intent." *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013). If the contract's terms are clear, courts should determine the parties' intent from the contract's language without applying rules of construction. 297 Kan. at 15. When interpreting a contractual provision, courts should consider the entire instrument from its four corners, instead of isolating a particular sentence or provision. *Waste Connection of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013).

In dividing the marital property under the premarital agreement, Grace is entitled to the greater of $500,000 or half the marital property's net fair market value. The first step in dividing the marital property then is to determine its net fair market value. But the parties disagree on the meaning of net fair market value. Alan contends the Sanibel home's net fair market value is the selling price minus their mortgage debt. Grace contends the net proceeds determine the net fair market value.

The language of the agreement resolves this dispute. The premarital agreement defines net fair market value as "the fair market value of the Marital Property at the termination of the marriage, less debt secured thereby." Fair market value is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction." Black's Law Dictionary 1785 (10th ed. 2014). On the other hand, net proceeds are "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)." Black's Law Dictionary 1399 (10th ed. 2014). Based on this language, Grace's argument that "net fair market value" means "net proceeds" lacks merit.

The Sanibel home sold for $2,500,000. This is the home's fair market value—the price the buyer was willing to pay. The home secured a $1,557,771.05 mortgage. According to the premarital agreement, this is the only expense that can be subtracted from the home's fair market value when calculating the net fair market value. Subtracting $1,557,771.05 from $2,500,000 leaves $942,228.95. This is the Sanibel home's net fair market value under the agreement. Adding the net fair market value of the other marital property, the marital property's total net fair market value is $1,187,188.97.

The district court held in its original judgment that the Sanibel home's net proceeds would be divided according to the agreement, after accounting for any expenses the court found appropriate. To determine the Sanibel home's net proceeds, the sale costs

10

must be subtracted from the marital property's net fair market value. These costs would include the settlement charges and the amount paid for repairs (listed as "reductions in amount due to seller" on the HUD Settlement Statement and in the district court's judgment).

The district court also held in its original judgment that the proceeds from the Sanibel home must also be used to reimburse Alan for carrying costs. The parties agreed Alan would receive $275,000 for reimbursement in their letter agreement. In that same agreement, the parties also agreed Grace would receive $5,000 as reimbursement, and they would divide the refunds between them evenly. The district court thus did not err because its calculation of Grace's marital property award complied with the original judgment and the parties' agreements.

Grace alternatively suggests she should receive half the net fair market value as calculated by the district court, but without deducting the sale costs and reimbursements or adding the refunds at all. But this flouts the district court's original judgment. As already explained, the court held that the Sanibel home's net proceeds would be divided according to the agreement, after accounting for any expenses the court found appropriate. As Grace notes in her brief, the district court had to deduct these costs to calculate the net proceeds in accordance with its original judgment. Grace also agreed Alan would receive $275,000 in reimbursements as ordered by the district court. As a result, this argument also lacks merit.

*Did the District Court Exceed the Scope of Remand?*

Grace also argues the district court exceeded the scope of the remand when it ruled on Alan's motion to reconcile and enforce. She contends the mandate in *South I* limited the district court's jurisdiction to calculating her 2014 tax liability and subtracting that

from her marital property award. According to Grace, the district court lacked jurisdiction to make any adjustments to the marital property award.

Alan argues *South I* did not address the particular issue of the adjustments, so the district court could consider them. The district court's order also did not run contrary to any rulings in *South I*. He adds that the adjustments Grace complains about fall into three categories: (1) sale costs the parties had already agreed to pay out of the sale proceeds; (2) reimbursements Grace agreed to pay in the letter agreement; and (3) refunds received at or after closing on the Sanibel home. By filing his motion, Alan contends he was not asking the district court to modify or change the property division but to enforce it.

"Interpretation of an appellate court mandate and the determination of whether the district court complied with it on remand are both questions of law subject to de novo review." *State v. Morningstar*, 299 Kan. 1236, 1240-41, 329 P.3d 1093 (2014). Whether jurisdiction exists is also a question of law over which this court has unlimited review. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017).

The mandate and opinion from an appellate court "shall be controlling in the conduct of any further proceedings necessary in the district court." K.S.A. 60-2106(c). When an appellate court remands for further proceedings after a decision, the district court must proceed in accordance with the appellate court mandate. *Gannon v. State*, 303 Kan. 682, Syl. ¶ 2, 368 P.3d 1024 (2016). "The district court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces, and it has no authority to consider matters outside the mandate." 303 Kan. 682, Syl. ¶ 2. "Where the mandate of an appellate court merely reverses a ruling of the district court and remands the case for further proceedings but does not direct the judgment of the district court, the district court has discretion to preside over the remaining trial proceedings, as if the district court had originally made

12

the ruling mandated by the appellate court." *Edwards v. State*, 31 Kan. App. 2d 778, 781, 73 P.3d 772 (2003).

The *South I* court affirmed the district court's judgment in part but remanded the issue of Grace's tax liability. 2017 WL 2017 WL 840233, at *1. "[T]he district court should calculate a precise dollar amount for which Grace must reimburse Alan for her share of the 2014 income tax liability, and the district court should make specific findings to support its calculation." 2017 WL 2017 WL 840233, at *11.

In ruling on Grace's motion to alter or amend, the district court held it did not violate *South I*'s mandate by applying the adjustments to the marital property award. The district court found that an appellate court can limit a district court on remand by either (1) preventing the district court from reconsidering issues the appellate court has decided, or (2) restricting the district court's jurisdiction. The court found that neither circumstance applied here.

The district court found *South I* did not explicitly rule on the adjustments nor did it rule on them by necessary implication. The court noted an appellate court rules by necessary implication in three scenarios: (1) the appellate court necessarily had to have considered the issue in the prior appeal to reach a decision; (2) consideration of the issue on remand would abrogate the appellate court's decision; or (3) the issue is so closely related to an issue explicitly resolved by the appellate court that it needs no more consideration. The district court held that none of these applied to the adjustments.

The district court also found *South I*'s mandate did not limit its jurisdiction over the adjustments. The district court held that *South I* had directed a judgment as to all the findings and conclusions it affirmed. The district court noted that none of its orders were contrary to those affirmed by *South I*. The district court also held that all the adjustments were newly discovered facts essential to implementing *South I*'s mandate.

13

On appeal, Grace argues that applying the adjustments were not essential to implementing *South I*'s mandate and the district court was limited to calculating her tax liability and then determining her marital property award without the adjustments. Alan reiterates the district court's reasoning. He also argues the adjustments were essential because the parties would still be "deadlocked" if the district court did not rule on them.

Both parties seem to have misframed the issue. When the district court determined Grace's and Alan's marital property awards, it was not doing so as part of the remand; it was doing so in response to Alan's motion to reconcile and enforce. While a district court lacks continuing jurisdiction to change or modify the division of property in an original divorce decree, the court has inherent jurisdiction to enforce or clarify its previous order. *Koch Engineering Co. v. Faulconer*, 227 Kan. 813, 830, 610 P.2d 1094 (1980); *In re Marriage of Nelson*, No. 102,574, 2010 WL 4977112, at *3 (Kan. App. 2010) (unpublished opinion). Here, the district court's original order provided that the Sanibel home's net proceeds would be divided in accordance with the premarital agreement after accounting for any expenses. The original order provided no exact dollar amount. In issuing its second order, the court was clarifying and enforcing its prior judgment by calculating the actual dollar amount. The court thus had jurisdiction to enter the order.

Grace also argues that Alan presented "additional issues . . . after the conclusion of this case." But as Alan argues, all the district court's adjustments to the marital property value were addressed in prior orders or agreements. In its original judgment, the court held that the Sanibel home's net proceeds would be distributed in accordance with the premarital agreement. In calculating the net proceeds, the court would subtract expenses such as closing costs, carrying costs, and the mortgage. In addition, in the letter agreement, Grace agreed to reimburse Alan $275,000 for carrying costs. The parties also agreed on how to divide the refunds received after the Sanibel home's sale.

14

*Minimum Payment Under Premarital Agreement*

Finally, Grace resurrects her argument that the premarital agreement guarantees she receive at least $500,000. She argues the district court violated the agreement by subtracting her tax liability and the adjustments related to the Sanibel home from her marital property award. She contends both the district court and we have misinterpreted the agreement, and she invites us to adopt Judge Arnold-Burger's dissent in *South I*.

Alan argues the *South I* court already rejected Grace's argument. He contends we should not reconsider the ruling under the law of the case doctrine because Grace has not shown that the *South I* court's ruling was clearly erroneous or manifestly unjust. He also asserts that in addition to the premarital agreement, the district court's prior orders and the letter agreement also control the outcome of the case.

While the law of the case doctrine is discretionary, once a court has decided an issue, that issue should ordinarily not be relitigated or reconsidered unless clearly erroneous or manifestly unjust. *State v. Collier*, 263 Kan. 629, Syl. ¶¶ 2-3, 952 P.2d 1326 (1998). Courts generally consider issues decided on a first appeal as settled law of the case in a second appeal in the same case. *State v. Parry*, 305 Kan. 1189, 1195, 390 P.3d 879 (2017). If a party fails to appeal a court ruling, it becomes the law of the case. See *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1212, 308 P.3d 1238 (2013).

In this appeal, Grace's argument is slightly different from her argument in *South I*. She claims the district court violated the premarital agreement by not only subtracting her tax liability from her award but also by applying the adjustments. But this argument is not materially different from her argument in *South I*. She is reasserting that the premarital agreement guarantees she receive at least $500,000. The *South I* court rejected this argument. 2017 WL 840233, at *12. If Grace disagreed with this court's ruling in *South I*,

she could have filed a petition for review with the Kansas Supreme Court. Grace has not shown that the *South I* court's decision was clearly erroneous or manifestly unjust. As a result, we decline to reconsider the issue under the law of the case doctrine.

Affirmed.